UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS UNIT FOOD PRODUCERS, et al., | 1:09-cv-01871 OWW DLB |
| Plaintiffs, | MEMORANDUM DECISION RE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. 24) AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. 17) |
| v. | |
| UNITED STATES OF AMERCIA; DEPARTMENT OF THE INTERIROR; BUREAU OF RECLAMATION, | |
| Defendants. | |

## I. INTRODUCTION

This case concerns the ongoing operation of the San Luis Unit (the "Unit") of the Central Valley Project ("CVP"). Plaintiffs, San Luis Unit Food Producers ("Food Producers"), an unincorporated association whose members include owners, operators, and managers of agricultural land in the Unit and their allied customers and suppliers, and various individuals and entities that own land and/or farm in the Unit, claim that various provisions of U.S. Reclamation law mandate that the Unit be operated to: (a) "provide farmers with irrigation water service" (Doc. 1, Compl. at ¶2); (2) "exercise the water rights obtained to divert, store, convey, and deliver the water necessary to irrigated project lands" (*id.* at ¶3);  and (3) "sell project water to irrigators

1

... in order to recoup the costs of construction and operation and maintenance of water supply works providing irrigation" (*id.* at ¶4).   Plaintiffs generally allege that the Department of the Interior and its Bureau of Reclamation ("Reclamation" or "Bureau") (collectively, "Federal Defendants") have managed the Unit in recent years in violation of these mandates:

> 10.  In recent years, however, pursuant to a highly controversial new practice, defendants have unlawfully withheld from Unit farmers the irrigation water service mandated by federal reclamation statutes. Defendants are not operating certain pumps, dams, canals, and other facilities they previously built to provide such service, and such facilities now sit effectively idle. Defendants do not now exercise the water rights to bring about use of the water at the place and for the purpose of the appropriation. Defendants no longer sell project water to Unit irrigators, but allow virtually all of the water to be used without charge for other purposes and in other places. In the absence of defendants' obedience to the above statutory mandates, plaintiffs' lands and trees are being destroyed, and their farming operations are suffering massive and possibly fatal losses.

> 11.  The first sentence of Section 1(a) of the 1960 Act authorizes construction and operation of the Unit as an integral part of the CVP for the "principal purpose" of furnishing water for the irrigation of lands in the Unit service area and, in addition, for several other specified purposes "as incidents thereto." But, as a result of defendants' recent statutory violations, the principal purpose of the Unit is being treated as if it were, at most, a mere incidental purpose, and a purpose designated as incidental is being treated as if it were the principal purpose. The defendants have unlawfully turned the Unit on its head.

*Id.* at ¶¶ 10-11.

Federal Defendants move for judgment on the pleadings

2

that:

   (1) **The United States has not waived its sovereign immunity to Plaintiffs' claims; and**

   (2) **The Court lacks subject matter jurisdiction.**

Doc. 25.  Plaintiffs oppose.  Doc. 36.  Federal Defendants replied.  Doc. 45.

 Plaintiffs' cross-move for judgment on the pleadings, arguing that:

   (1) **The Court has subject matter jurisdiction;**

   (2) **The APA provides an applicable waiver of sovereign immunity;**

   (3) **Plaintiffs have standing to sue;**

   (4) **Plaintiffs have exhausted any required administrative remedies;**

   (5) **The action is not barred by the statute of limitations;**

   (6) **The action is not barred by laches;**

   (7) **Plaintiffs are entitled to declaratory and injunctive relief.**

Doc. 18 at 5-11.  In addition, Plaintiffs move for summary judgment that Defendants are violating fifteen (15) Reclamation statutes.  Specifically, Plaintiffs allege:

3

(1) Five provisions of reclamation law mandate that Federal Defendants operate project facilities to provide irrigation water service, namely:

    (a)  The second sentence of Section 1(a) of the 1960 Act;

    (b)  A 1920 Amendment to the 1902 Reclamation Act;

    (c)  Section 6 of the 1902 Act;

    (d)  The second proviso of Section 2 of the 1937 Act;

    (e)  The fourth proviso of Section 2 of the 1937 Act;

(2) The following four Reclamation statutes mandate that defendants exercise water rights:

    (a)  The 1920 amendment to the 1902 Act;

    (b)  The last sentence of Section 1(a) of the 1960 Act;

    (c)  The proviso of Section 8 of the 1960 Act;

    (d)  Section 8 of the 1902 Act; and

(3) The following six statutes mandate that Defendants sell irrigation water to farmers to recoup project costs:

4

1          (a) Section 4 of the 1902 Act;

2          (b) A 1914 amendment to the 1902 Act

3          (c) A 1926 amendment to the 1902 Act

4          (d) A 1939 amendment to the 1902 Act

5          (e) Section 1(5) of the 1956 amendments to

6          the 1902 Act

7

8          (f) Another provision of the 1956 amendments

9          to the 1902 Act.

10   Doc. 18.   Federal Defendants oppose both the motion for

11   judgment on the pleadings and the motion for summary

12   judgment.   Doc. 38.   Plaintiffs replied.   Doc. 43.[1]

13        Oral argument was heard on August 3, 2010, at which

14   time the parties were granted leave to submit

15

16   _____

17   [1] Plaintiffs request judicial notice of a number of documents,
including numerous reports and fact sheets issued by the Bureau of

18   Reclamation and other federal agencies; findings of fact and other
court orders and judgments filed in related litigation; and

19   declarations filed by a Bureau of Reclamation employee in related
litigation.  Federal Rule of Evidence 201(b) permits judicial notice

20   of facts "not subject to reasonable dispute in that it is either (1)
generally known within the territorial jurisdiction of the trial

21   court or (2) capable of accurate and ready determination by resort
to sources whose accuracy cannot reasonably be questioned."  As to

22   those documents the contents of which are disputed:

23        [A] court can only take judicial notice of the existence of
          those matters of public record (the existence of a motion or of

24        representations having been made therein) but not of the
          veracity of the arguments and disputed facts contained therein.

25        Similarly, a court may take judicial notice of the existence of
          certain matters of public record. A court may not take judicial

26        notice of one party's opinion of how a matter of public record
          should be interpreted.

27   United States v. S. Cal. Edison Co., 300 F. Supp. 2d 964, 974 (E.D.
Cal. 2004) (citations omitted) (emphasis in original).

28
                                   5

supplemental briefs on a limited range of issues.  Docs. 52 and 53.  Those briefs have also been considered.

## II.    LEGAL & FACTUAL BACKGROUND.

### A. History and Original Purposes of the CVP.

The Reclamation Act of 1902 ("1902 Act"), Pub. L. 57-161, 32 Stat. 388 (codified as amended at 43 U.S.C. §§ 371-600e), "set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States." *Orff v. United States*, 545 U.S. 596, 598 (2005) (citing *California v. United States*, 438 U.S. 645, 650 (1978)).  In the 1902 Act, "Congress committed itself to the task of constructing and operating dams, reservoirs and canals for the reclamation of the arid lands in 17 western states." *Peterson v. Dept. of the Interior*, 899 F.2d 799, 802 (9th Cir. 1990). Its goals were "to promote the growth of an agricultural society in the West." *Id.* at 803.  "The purpose of the original 1902 Act was to encourage people to go West, ... to grow crops on modest family farms in the country's drier regions so that the nation's agricultural bounty would increase." *Barcellos and Wolfsen v. Westlands Water District*, 899 F.2d 814, 815 (1990).

The CVP, the largest reclamation project in the

6

nation, was created to "capture and store" waters of the major Central Valley rivers and "pump" the waters "to the cultivated lands." *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728-29, 733 (1950).  The CVP was created to bring to the valley's "parched acres a water supply sufficiently permanent to transform them into veritable gardens for the benefit of mankind." *Ivanhoe Irrigation District*, 357 U.S. 175, 280 (1958), rev'd on other grounds by *California v. United States*, 438 U.S. 645.  Snowmelts from the Sierra Nevada, if not controlled, "waste this phenomenal accumulation of water so valuable to the valley's rich alluvial soil.  The object of the plan is to arrest this flow and regulate its seasonal and year-to-year variations..." *Id*. at 281. "The absence of rain" in the region served by the CVP, "makes irrigation essential, particularly in the southern region." *Id*.  "The grand design of the Project was to conserve and put to maximum beneficial use the waters of the Central Valley of California..." *Dugan v. Rank*, 372 U.S. 609, 612 (1963); *see also United States v. Westlands Water District*, 134 F. Supp. 2d 1111, 1116 (E.D. Cal. 2001) (citing above cases).

The 1937 Rivers and Harbors Act, Pub. L. 75-397, 50 Stat. 844, 850, authorized a large scale diversion of

1  surplus water from the delta to the valley by means of

2  the Jones Pumping Plant and the Delta-Mendota Canal, both

3  of which had excess capacity.  The Act of June 3, 1960,

4  Pub. L. No 86-488, 74 Stat. 156, described the pumping

5  plant and canal as integral parts of the Unit; Section 4

6  thereof describes diversion from the Delta via the

7  pumping plant and the canal.  *See Sierra Club v. Andrus*,

8  610 F.2d 581, 585-86, 602-03, 604-05 (9th Cir. 1980).

9

10      B. <u>Modern Administration of Central Valley Project and
           Delivery of Water Under Reclamation Law.</u>

11          Pursuant to Section 8 of the Reclamation Act of 1902,

12  Reclamation must obtain and maintain the water rights

13  necessary for its CVP operations in compliance with state

14  law.  43 U.S.C. § 383.  Permits and licenses issued by

15  California's State Water Resources Control Board

16  ("SWRCB"), together with relevant SWRCB decisions and

17  orders, define the parameters and conditions under which

18  Reclamation may divert and deliver project water, which

19  is then allocated to water districts in accordance with

20  the terms and conditions of contracts for water service

21  with these districts.  Declaration of Ray Sahlberg, Doc.

22  40, ("Sahlberg Decl.") ¶ 2; Declaration of Richard

23  Stevenson, Doc. 41, ("Stevenson Decl.") ¶ 3.  Reclamation

24  does not contract with individual irrigators or end-users

25  on municipal and industrial water contracts.  Stevenson

8

Decl., Doc. 41, at ¶ 4.

Reclamation's diversion and delivery of project water to the San Luis Unit is governed by 13 separate permits, the authorized purposes of which include irrigation, domestic use, municipal and industrial use, fish and wildlife enhancement, salinity control, water quality control, stock-watering, and recreation.  Sahlberg Decl. ¶ 3; Declaration of Ron Milligan ("Milligan Decl.", Doc. 42, ¶ 2.  Reclamation's CVP operations are also constrained by the need to comply with requirements established by the U.S. Fish & Wildlife Service and National Marine Fisheries Service to protect various fish species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*  Milligan Decl., Doc. 42, at ¶ 2.

In September 1985, Reclamation requested SWRCB approval of a petition to consolidate the places and purposes of use of its various permits governing appropriations for the CVP, to allow for better coordinated management of CVP operations and to facilitate those operations necessary to comply with CVPIA mandates.  Sahlberg Decl., Doc. 40, at ¶ 4.  The SWRCB approved that petition in Decision (Revised) No. D-1641 ("D-1641"), issued in March 2000.  *Id.*

Each year Reclamation projects the amount of water

9

1   that will be available based upon reservoir storage,

2   precipitation, runoff forecasts, and other indices.

3   Stevenson Decl., Doc. 41, at ¶ 5; Milligan Decl., Doc.

4   42, at ¶¶ 2, 3.  Based on that projection and after

5   taking into account the amount of water required to

6   satisfy statutory and regulatory requirements,

7   Reclamation determines the amount of water that can be

8   delivered and allocated to its various contractors,

9   including irrigation districts, municipal and industrial

10  users, and wildlife refuges.  Stevenson Decl., Doc. 41,

11  at ¶ 5; Milligan Decl., Doc. 42, at ¶ 3.  Reclamation's

12  water service contracts, including those in the San Luis

13  Unit, contain shortage provisions that specifically

14  recite that Reclamation is not liable for shortages

15  caused by compliance with legal obligations.  Stevenson

16  Decl., Doc. 41. at ¶ 5.[2]

17       In addition to other operational and regulatory

18  requirements, certain physical limitations constrain

19  Reclamation's operation of the San Luis Unit.  Milligan

20  Decl., Doc. 42, at ¶ 4.  For example, in water year 2009,

21  CVP pumping operations were impacted variously by dry

22  weather hydrology, requirements imposed by D-1641, ESA

---

[2] A shortage provision similar to that in the current San Luis contracts was challenged in this Court by Westlands Water District and was upheld by the Ninth Circuit.  *Id.* at ¶ 6.  *See O'Neill v. United States*, 50 F.3d 677, 682-86 (9th Cir. 1995).

10

mandates, physical limitations of the facilities, or by a combination of several of these constraints. *Id.* at ¶ 4.

### III.   STANDARDS OF DECISION

**A.** **Motion for Judgment on the Pleadings.**

Federal Rule of Civil Procedure 12(c) states, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."  "[I]f a party raises an issue as to the court's subject matter jurisdiction on a motion for a judgment on the pleadings, the district judge will treat the motion as if it had been brought under Rule 12(b)(1)."  *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2004); *Rutenschroer v. Starr. Seigle Comm'n, Inc.,* 484 F. Supp. 2d 1144, 1147-48 (D. Haw. 2006).

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of jurisdiction over the subject matter."  Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of subject matter jurisdiction.  *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).  A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears.  *Kokkonen v. Guardian Life Ins. Co of Am.*, 511 U.S. 375, 377 (1994).  A

11

challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004)

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003; *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element

necessary for subject matter jurisdiction." *Id*.

When Rule 12(c) is used to raise the defense of failure to state a claim upon which relief can be granted, the standard governing the Rule 12(c) motion for judgment on the pleadings is the same as that governing a Rule 12(b)(6) motion. *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988). A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In deciding whether to grant a motion to dismiss, the court "accept [s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (May 18, 2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that defendant has acted unlawfully. Where a complaint pleads facts

13

that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly*, 550 U.S. 556-57).  Dismissal also can be based on the lack of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

B. <u>Motion for Summary Judgment.</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323 (internal quotation marks omitted).

Where the movant has the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the

moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim on which it has the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted).  With respect to an issue as to which the non-moving party has the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving party must show there exists a genuine dispute (or

15

issue) of material fact.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

## IV.   <u>ANALYSIS</u>

### A. <u>Standing.</u>

Plaintiffs' motion for judgment on the pleadings seeks a determination that Plaintiffs have standing to sue.  Doc, 18 at 6-10.  Defendants oppose Plaintiffs' motion but do not cross-move as to standing.  Doc. 38 at 8-10 (opposition); Doc. 25 (no mention of standing in motion for judgment on the pleadings).  Nevertheless, a court has a *sua sponte* duty to examine standing in every case.  *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).

### 1. <u>General Legal Standard Re Standing.</u>

Standing is a judicially created doctrine that is an

16

essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision."  *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted).

In addition to the constitutional requirements of Article III, courts have developed a set of prudential

17

considerations to limit standing in federal court to prevent a plaintiff "from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474-75 (1982) (quoting *Warth*, 422 U.S. at 499-500).  To that end, "the plaintiff's complaint must fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  In cases arising under the APA, this requirement is particularly important given the limitations of 5 U.S.C. § 702, which "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'"  *Association of Data Processing Serv. Orgs*, 397 U.S. at 153-54 (citing § 702).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the

1          burden of proof, i.e., with the manner and
           degree of evidence required at the successive
2          stages of the litigation.  At the pleading
           stage, general factual allegations of injury
3          resulting from the defendant's conduct may
           suffice, for on a motion to dismiss we presume
4          that general allegations embrace those specific
           facts that are necessary to support the claim.
5          In response to a summary judgment motion,
           however, the plaintiff can no longer rest on
6          such "mere allegations," but must "set forth" by
           affidavit or other evidence "specific facts,"
7          Fed. Rule Civ. Proc. 56(e), which for purposes
           of the summary judgment motion will be taken to
8          be true. And at the final stage, those facts (if
           controverted) must be supported adequately by
9          the evidence adduced at trial.

10   *Lujan,* 504 U.S. at 561; *see also Churchill County v.*

11   *Babbitt*, 150 F.3d 1072, 1077 (9th Cir. 1998).

12        A plaintiff is not required to prove that he would

13   succeed on the merits to summarily adjudicate his

14   standing to sue.  *Farrakhan v. Gregoire*, 590 F.3d 989,

15   1001 (9th Cir. 2010) (granting summary judgment and

16   noting that "[w]hether Plaintiffs can succeed on their []

17   claim is irrelevant to the question whether they are

18   entitled to bring that claim in the first place.").

19   However, the underlying claims are not wholly irrelevant:

20

21          Although standing in no way depends on the
           merits of the plaintiff's contention that
22          particular conduct is illegal, *e.g., Flast v.*
           *Cohen,* 392 U.S. 83, 99 (1968), it often turns on
23          the nature and source of the claim asserted. The
           actual or threatened injury required by Art. III
24          may exist solely by virtue of 'statutes creating
           legal rights, the invasion of which creates
25          standing ....' *See Linda R.S. v. Richard D.,*
           *supra*, 410 U.S., at 617 n. 3; *Sierra Club v.*
26          *Morton*, 405 U.S. 727, 732 (1972). Moreover, the
           source of the plaintiff's claim to relief
27

28
                              **19**

assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief....

*Warth*, 422 U.S. at 500.

## 2. Actual Injury.

The first element of Article III standing is injury-in-fact, which *Lujan* defines as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural or hypothetical.'"  504 U.S. at 560 (internal citations omitted).

Here, the Complaint alleges that, in recent years, Plaintiffs[3] and other Unit farmers have purchased from the Bureau and applied to their lands substantially less water for irrigating their crops than they historically bought and used and to which they are allegedly entitled.

_____

[3] Plaintiffs include numerous individuals and entities, as well as an organization, the San Luis Unit Food Producers ("Food Producers"). An organization or association has standing to sue on behalf of its members when (a) its members would have standing, (b) the interests it asserts are germane to its purpose, and (c) its claim for relief does not require its members' participation.  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Here, it is undisputed that, if any one of its members possesses standing, Food Producers, which was formed for the purpose of taking action to "restore full irrigation water service to Unit lands and, thereby, render such lands productive again," Declaration of Brad Gleason, Doc. 20, at ¶ 8, meets the elements of *Hunt*.

20

Doc. 1, Compl. at ¶¶ 25-26.   Federal Defendants do not dispute that each plaintiff is suffering concrete and particularized injury.

### 3. Causation.

The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and not be "the result of the independent action of some third party not before the court."  *Tyler v. Cuomo*, 236 F. 3d 1124, 1132 (9th Cir. 2000).   The causation element is lacking where an "injury caused by a third party is too tenuously connected to the acts of the defendant."  *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003). For the purposes of determining standing, while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight ... as to demonstrate that the plaintiffs would succeed on the merits.'"  *Ocean Advocates v. U.S. Army Corps. Of Eng'rs,* 402 F.3d 846, 860 (9th Cir. 2005).

Here, Plaintiffs' maintain that various provisions of Reclamation law require the Bureau to sell and deliver to them a "normal" supply of irrigation water and that their "current inability to purchase and apply to their lands

each year a normal supply of irrigation water is directly caused by the Bureau's failure and refusal to sell and deliver it."  Doc. 18 at 8.

It is undisputed that the Bureau's delivery of water to Unit farmers has been reduced in recent years.  *See* Milligan Decl., Doc. 42, at ¶ 4 (admitting that hydrologic conditions, Delta pumping constraints, and operational requirements needed to meet D-1641 have caused delivery curtailments in recent years). Plaintiffs' injury is fairly traceable to the Bureau's failure to deliver water.  Whether and to what extent the cited statutes actually require the Bureau to deliver particular volumes of water is disputed.

Federal Defendants argue that Plaintiffs cannot possibly establish causation because they have no rights to Project water, which are held by Reclamation.  Doc. 38 at 9.  It is undisputed that Plaintiffs are not in contractual privity with Reclamation, but Plaintiffs do not allege breach of contract.  *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210–1212 (9th Cir. 1999) (irrigators had no standing to bring breach of contract claim against Reclamation because not indended third-party beneficiaries of contract).  Federal Defendants do not explain why the absence of contractual

privity bars Plaintiffs' claims under the APA based on the Bureau's non-compliance with Reclamation law.  In *NRDC v. Patterson*, 791 F. Supp. 1425, 1429-32 (E.D. Cal. 1992), environmental plaintiffs with recreational interests on the San Joaquin River below Friant Dam had standing to sue the Bureau for allegedly violating Section 8 of the 1902 Reclamation Act, which Plaintiffs claimed imposed the requirements of a state fish protection statute on Friant Dam operations.  Causation was not an issue, but *Patterson* confirms that an APA claim does not require that Plaintiffs be in privity with the Bureau, if they otherwise satisfy the standing requirements.

        4. <u>Redressibility.</u>

        Standing also requires that the injury likely can be redressed by a favorable court decision.  *Lujan*, 504 U.S. at 561.  Plaintiffs seek declaratory relief that defendants have 15 mandatory duties under reclamation statutes and that they are violating each of them.  Doc. 18 at 9.  Plaintiffs assert that obtaining such a declaration will induce defendants to once again honor those duties and, thereby, operate project facilities, exercise water rights, and sell irrigation water in a manner that increases water deliveries to Plaintiffs.

*See id.*  "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."  *See Warth*, 422 U.S. at 500.  If Plaintiffs' obtain a ruling declaring that the Bureau's reduced deliveries to members of the Unit violate the various statute they invoke, there is a substantial likelihood that their injury will be redressed, at least in part.

### 5. <u>Zone of Interest.</u>

Finally, Plaintiffs APA "complaint must fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Service Orgs.*, 397 U.S. at 153).  The interest asserted by the plaintiff must bear a plausible relationship to the policy underlying the statute.  *NRDC v. Patterson*, 791 F. Supp. at 1429-30.

> [T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief....

*Warth*, 422 U.S. at 500

Federal Defendants argue that Plaintiffs cannot

24

satisfy the zone of interest requirement for any of their claims because "none of the statutory provisions upon which Plaintiffs rely provides any guarantee of water deliveries, ... [and] [t]hose matters that are in fact addressed by those statutory provisions, such as the manner in which Reclamation may set water contract rates, e.g., 43 U.S.C. § 485h(e), or provide funding for the operation and maintenance of Reclamation facilities, e.g., 43 U.S.C. §§ 391, 491, have nothing to do with Plaintiffs' claimed injuries."  Doc. 38 at 9.

Plaintiffs assert that Defendants are violating five statutes that require the Bureau to operate the Unit to deliver and sell Plaintiffs increased volumes of water. *See* Doc. 18 at 8-9.  If the interest asserted by Plaintiffs in increased water deliveries bears a plausible relationship to the policy underlying the cited statutory provisions, Plaintiffs, as users of that water, arguably fall within the zone of interests protected by the statutes.

B. Sovereign Immunity/APA.

Federal Defendants assert the defense of sovereign immunity.  The United States, as a sovereign, is immune from suit unless it has waived its immunity.  *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999).  A

1   court lacks subject matter jurisdiction over a claim

2   against the United States if it has not consented to be

3   sued on that claim.  *Consejo de Desarrollo Economico de*

4   *Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th

5   Cir. 2007).  "When the United States consents to be sued,

6   the terms of its waiver of sovereign immunity define the

7   extent of the court's jurisdiction."  *United States v.*

8   *Mottaz*, 476 U.S. 834, 841 (1986).  A waiver of sovereign

9   immunity by the United States must be expressed

10  unequivocally.  *United States v. Nordic Village*, Inc.,

11  503 U.S. 30, 33 (1992).  As a general matter, purported

12  statutory waivers of sovereign immunity are not to be

13  liberally construed.  *Id*. at 34.

14      The Administrative Procedure Act ("APA") waives

15  sovereign immunity and prescribes standards for judicial

16  review of certain agency actions.  *See* 5 U.S.C. § 702

17  (granting standing to plaintiffs "suffering legal wrong

18  because of agency action, or adversely affected or

19  aggrieved by agency action within the meaning of a

20  relevant statute").[4]

---

[4] Federal Defendants argue that the Court lacks subject matter jurisdiction over the claims in this case.  The APA does not create subject matter jurisdiction.  *Califano v. Sanders*, 430 U.S. 99, 105-107 (1977); *see also Gallo Cattle Co. v. U.S. Dep't of Agric.,* 159 F.3d 1194, 1198 (9th Cir. 1998).  Rather, "jurisdiction must come from a source other than the APA."  *Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 929 (9th Cir. 2003).  Similarly, while 28 U.S.C. § 1331

1    The APA's waiver of sovereign immunity contains

2    several limitations.  *See Gallo Cattle Co. v. United*

3    *States Dep't of Agriculture*, 159 F.3d 1194, 1198 (9th

4    _____

5    provides a general grant of subject matter jurisdiction over claims
6    "arising under the Constitution, laws, or treaties of the United
     States," this general grant of jurisdiction does not by itself
7    create a federal question.  "A claim arises under federal law within
     § 1331 if it is apparent from the face of the complaint ... that
8    ... a federal law creates the plaintiff's cause of action."  *Virgin
     v. County of San Luis Obispo*, 201 F.3d 1141, 1142-43 (9th Cir.
9    2000).  Plaintiffs' claim must therefore be grounded in some
     substantive provision of federal law besides § 1331.
10        Federal Defendants argue that this Court lacks subject matter
     jurisdiction under § 1331 because the statutes invoked by Plaintiff,
11   although admittedly federal law, don't contain the mandates
     Plaintiffs allege.  This is a challenge to the merits of Plaintiffs'
12   claims, not to the existence of subject matter jurisdiction.  The
     face of the Complaint clearly raises federal questions.  Whether
13   Plaintiffs satisfy the prudential/zone of interest standing
     requirement and/or their complaint fails to state any claims upon
14   which relief may be granted is a separate question.
          The cases cited by Federal Defendants do not stand for the
15   proposition that subject matter jurisdiction turns on whether a
     plaintiff's interpretation of the federal statute they invoke is
16   correct.  For example, the plaintiffs in *Virgin*, 201 F.3d at 1142,
     claimed to hold a federal land patent to 1,240 acres in San Luis
17   Obispo County.  The plaintiffs applied to the County for a lot line
     adjustment on their lands, but the request was denied.  *Id.*
18   Plaintiffs then attempted to sue the County in federal court,
     seeking declaratory and injunctive relief.  The Ninth Circuit
     affirmed previous rulings holding that federal land patents do not
19   confer federal question jurisdiction, relying on *Shulthis v.
     McDougal*, 225 U.S. 561, 569-70 (1912), which held:

20        A suit to enforce a right which takes its origin in the laws of
          the United States is not necessarily, or for that reason alone,
21        one arising under those laws, <u>for a suit does not so arise
          unless it really and substantially involves a dispute or</u>
22        <u>controversy respecting the validity, construction or effect of
          such a law, upon the determination of which the result depends</u>.
23        This is especially so of a suit involving rights to land
          acquired under a law of the United States. If it were not,
24        every suit to establish title to land in the central and
          western states would so arise, as all titles in those states
25        are traceable back to those laws.

26   *Id.* at 1143.  Here, in contrast to *Virgin*, Plaintiffs allege that a
     federal agency is violating a federal law.  This involves the
27   "construction or effect" of a federal law "upon the determination of
     which the result depends."  This Court does not lack subject matter
     jurisdiction simply because Defendants disagree with Plaintiffs'
28   reading of the law.

27

Cir. 1998).   One of those limitations is the requirement that the challenged decision be a "final agency action for which there is no other adequate remedy in a court...."  5 U.S.C. § 704.

### 1. Agency Action.

The APA defines "agency action" to "includ[e] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).   Here, Plaintiffs allege that defendants are failing to act as required by 15 congressional commands.   However, "the only agency action that can be compelled under the APA is action legally required," *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63, 65 (2004) ("*SUWA*").

Plaintiffs' claims will only satisfy the APA's agency action requirement if they allege a failure to perform a mandatory, nondiscretionary act.  *SUWA*, 542 U.S. at 61-64; *Alvarado v. Table Mt. Rancheria*, 509 F.3d 1008, 1019-20 (9th Cir. 2007).   As with the prudential standing requirement, the resolution of the agency action inquiry turns on whether any of the cited provisions contain a legal mandate to deliver any specific volume of water.

### 2. Final Agency Action.

The parties engage in extended argument over whether

28

Plaintiffs' claims satisfy the "final agency action" requirement.  By its terms, the APA permits review only of "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court...."  5 U.S.C. § 704.  Where, as here, no specific statutory judicial review provision exists, the APA only applies to "final agency action."  *Id.*; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("*Lujan v. NWF*").  An agency action is deemed "final" for purposes of APA when it meets the following two criteria:

> First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature; and

> And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)(internal citations omitted).

Federal Defendants argue that Plaintiffs only challenge the day-do-day administration or operation of the Unit, citing *Lujan v. NWF*, 497 U.S. at 890-94, for the proposition that the day-to-day operation of a project or program is not "final agency action" reviewable under the APA.  *Lujan v. NWF* concerned various activities undertaken by the Bureau of Land Management to comply with the Federal Land Policy and Management Act

("FLPMA"), which, among other things:

> repealed many of the miscellaneous laws
> governing disposal of public land, 43 U.S.C. §
> 1701 et seq. []and established a policy in favor
> of retaining public lands for multiple use
> management. It directed the Secretary to
> "prepare and maintain on a continuing basis an
> inventory of all public lands and their resource
> and other values," § 1711(a), required land use
> planning for public lands, and established
> criteria to be used for that purpose, § 1712. It
> provided that existing classifications of public
> lands were subject to review in the land use
> planning process, and that the Secretary could
> "modify or terminate any such classification
> consistent with such land use plans." § 1712(d).
> It also authorized the Secretary to "make,
> modify, extend or revoke" withdrawals. §
> 1714(a). Finally it directed the Secretary,
> within 15 years, to review withdrawals in
> existence in 1976 in 11 Western States, §
> 1714(l)(1), and to "determine whether, and for
> how long, the continuation of the existing
> withdrawal of the lands would be, in his
> judgment, consistent with the statutory
> objectives of the programs for which the lands
> were dedicated and of the other relevant
> programs," § 1714(l )(2).

*Id*. at 877.  The *Lujan v. NWF* plaintiffs described "[t]he

activities undertaken by the BLM to comply with these

various provisions" as the BLM's "land withdrawal review

program."  *Id*.  Plaintiffs complained "the

reclassification of some withdrawn lands and the return

of others to the public domain would open the lands up to

mining activities, thereby destroying their natural

beauty."  *Id*. at 879.

The Supreme Court held that the so-called "land

withdrawal review program" was "not an 'agency action'

within the meaning of § 702, much less a 'final agency

30

action' within the meaning of § 704."  *Id.* at 890.

The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA. It is no more an identifiable "agency action"-much less a "final agency action"-than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration. As the District Court explained, the "land withdrawal review program" extends to, currently at least, "1250 or so individual classification terminations and withdrawal revocations." 699 F.Supp., at 332.

Respondent alleges that violation of the law is rampant within this program-failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide required public notice, failure to provide adequate environmental impact statements. Perhaps so. But respondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is

1

2

3

4

5

> a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately. Such agency action is "ripe" for review at once, whether or not explicit statutory review apart from the APA is provided. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 152-154 (1967); *Gardner v. Toilet Goods Assn., Inc.*, 387 U.S. 167, 171-173 (1967). *Cf. Toilet Goods Assn., Inc. v. Gardner*, 387 U.S. 158, 164-166 (1967).

6

7

*Id.*

8

9

10

However, eight years after and in reliance on *Lujan,* the Ninth Circuit in *ONRC Action v. Bureau of Land Management,* 150 F.3d 1132, 1137 (9th Cir. 1998)

11

12

13

reaffirmed that "a court's review of an agency's failure to act has been referred to as an exception to the final agency action requirement."  This exception operates when

14

15

16

17

18

the agency has a "clear duty to act" under the invoked statutory provision.  *Id.* at 1137-38.  Again, the resolution of this issue turns on an examination of the statutory claims.

19

20

### 3. Equitable Relief.

21

22

23

24

25

26

27

The parties engage in extensive argument regarding Plaintiffs' entitlement to declaratory and/or injunctive relief under the several statutes cited in the Complaint. These arguments are subject to sovereign immunity and subject matter jurisdiction determinations.  All parties appear to agree that if sovereign immunity has been waived and federal question jurisdiction exists, the APA

28

permits declaratory and injunctive relief.  5 U.S.C. §

703 (judicial review under the APA includes the remedies

of "declaratory judgments or writs of prohibitory or

mandatory injunction").

    4. **Failure to Exhaust Administrative Remedies.**

    Federal Defendants contend that "[o]ne or all of

Plaintiffs' claims are barred by Plaintiffs' failure to

exhaust administrative remedies."  Doc. 13 at 20.

Plaintiffs move for judgment on the pleadings that their

claims are not barred by an exhaustion defense.  Doc. 18

at 10.

    In an APA case, exhaustion "is a prerequisite to

judicial review only when expressly required by statute

or when an agency rule requires appeal before review and

the administrative action is made inoperative pending

that review."  *Darby v. Cisneros*, 509 U.S. 137, 154

(1993); *see, e.g.*, *Cedars-Sinai Medical Ctr. v Nat'l

League of Postmasters of U.S.*, 497 F.3d 972, 980-81 (9th

Cir. 2007) (because agency regulations only mandate

exhaustion of disputes between insurance carriers and

"covered persons," a third party is with no role in this

administrative process need not exhaust).

    Federal Defendants have not identified any applicable

statutory exhaustion requirement, nor have they

33

1    identified any exception to the *Darby* rule.

2         Plaintiffs' motion for judgment on the pleadings as

3    to exhaustion of administrative remedies is GRANTED.

4

5              5. <u>Statute of Limitations.</u>

6         Defendants' fourth defense is that some or all of

7    plaintiffs' claims are barred by the statute of

8    limitations.  Doc. 13 at 19.  Title 28, United States

9    Code, section 2401(a) provides a six year statute of

10   limitations applicable to civil actions commenced against

11   the United States:

12

13            Except as provided by [the Contract Disputes Act
             of 1978,] every civil action commenced against
14            the United States shall be barred unless the
             complaint is filed within six years after the
15            right of action first accrues. The action of any
             person under legal disability or beyond the seas
16            at the time the claim accrues may be commenced
             within three years after the disability ceases.

17   This limitations period applies to cases brought under

18   the APA.  *Hells Canyon Pres. Council v. United States*

19   *Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (general

20   six-year statute applies to APA claims).  Therefore,

21   unless excused, any claim arising earlier than October

22   23, 2003 (six years prior to the filing of the Complaint)

23

24   is time-barred.

25        Here, Plaintiffs suggest that the § 2401(a) six-year

26   limitations period should not bar their claims because

27   either (a) the violations alleged are continuing or (b)

28
                                34

the statute of limitations does not apply to claims based on an agency's actions in excess of statutory authority. Doc. 18 at 10.  As a general rule in the Ninth Circuit, § 2401(a)'s limitations period is not jurisdictional and is subject to traditional exceptions, such as equitable tolling, waiver, and estoppel.  *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997).  The continuing violation doctrine has been extended the § 2401(a) statute of limitations in federal employment and civil-rights litigation.  *See, e.g., Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812 (9th Cir. 2001); *Gutkowsky v. County of Placer*, 108 F.3d 256 (9th Cir. 2007).  However, the Ninth Circuit recently refused to extend the continuing violation doctrine to APA claims. *See Hall v. Regional Transp. Com'n of S. Nev.*, 362 Fed. Appx. 694, *2 (9th Cir. 2010) (unpublished) (citing with approval *Gros Ventre Tribe v. United States*, 344 F. Supp. 2d 1221, 1229 (D. Mont. 2004)).

Plaintiffs' alternative argument that the statute of limitations does not apply because the agency's actions are *ultra vires* is likewise unpersuasive.  This argument is based on *Wind River Mining Corp. v. United States*, 946 F.2d 710, 714-15 (9th Cir. 1991), which created an exception to the application of the statute of

35

limitations for claims in which a plaintiff asserts an agency acted in excess of its statutory authority. However, "a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger." *Id.* at 716; *see also NRDC v. Evans*, 232 F. Supp. 2d 1003, 1024 (N.D. Cal. 2002) (challenge to regulation as *ultra vires* must be brought within six years of application of that regulation to challenger). In this case, Plaintiffs allege that Reclamation's "shift in policy" began as early as 1987, Doc. 18 at 3, and should have been evident by the mid-1990s, Compl. at ¶ 49. Under *Wind River*, Plaintiffs were required to bring suit long before October 2009.

Plaintiffs' motion for judgment on the pleadings as to the statute of limitations defense is DENIED.

### 6. Laches.

Federal Defendants' fifth defense is that some or all claims are barred by the equitable doctrine of laches, i.e. delay with prejudice. Doc. 13 at 19. Plaintiffs move for judgment on the pleadings as to this affirmative defense. Federal Defendants do not oppose, as they claim no prejudice caused by allegedly inequitable delay. Plaintiffs' motion for judgment on the pleadings as to

36

1    the defense of laches is GRANTED.

2

3        C. **Analysis of Statutory Claims.**

4            1. **Threshold Issue: Arguments Raised by**
                **Defendants that Plaintiffs Maintain Were Not**
5               **Pled in the Answer.**

6    Plaintiffs complain that Federal Defendants have raised

7    certain "defenses" in their briefing that were not pled

8    in the answer.  Specifically, Defendants argue in various

9    places that Plaintiffs own contracts, D-1641, the ESA,

10   and the CVPIA bar the relief Plaintiffs seek.

11        Pleading rules require an answer to state in short

12   and plain terms the "defenses" to each claim asserted.

13   Fed. R. Civ. Pro. 8(b)(1)(A).  Any "denial" must fairly

14   respond to the substance of the allegations.  Rule

15   8(b)(2).  In responding to a complaint, an answer must

16   "affirmatively state any avoidance or affirmative

17   defense."  Rule 8(c)(1).  A defendant is barred from

18   raising any avoidance or affirmative defense by failing

19   to plead it in the answer.  *Prieto v. Paul Revere Life*

20   *Insurance Co.*, 354 F. 3d 1005, 1012-13 (9th Cir. 2004).

21   Defenses that are waived if not pled include: (1) conduct

22   in compliance with governmental regulations, or (2) a

23   statutory bar to recovery.  Wright & Miller, 5 Fed. Prac.

24   and Pro. Civ. (3d ed.) § 1271 n. 54, 59 (citing

25   authorities).

26

27

28

The complaint alleges that Defendants are violating 15 provisions of federal Reclamation law.  The answer asserts that the allegations of duty under the 15 reclamation statutes are "legal conclusions" and denies the charges of violation thereof.  Plaintiffs maintain that Defendants' arguments based on the contract, D-1641, the ESA, and the CVPIA should not be considered because they were not mentioned in the answer.  Plaintiffs' contention is without merit.  The Answer denies the existence of subject matter jurisdiction, Doc. 13 at 19 (First Defense), and asserts that some or all of Plaintiffs' claims fail to state a claim upon which relief may be granted, *id*. at 19 (Third Defense). Federal Defendants are free to cite the CVPIA, the ESA, and Section 8 of the 1902 Act, and any other relevant legal authority that supports these defenses.

2. <u>Statutory Provisions That Allegedly Require Operation of Irrigation Facilities.</u>

a. <u>Section 1(a) of the 1960 Act.</u>

The second sentence of Section 1(a) of the 1960 Act reads, in pertinent part:

> The principal engineering features of said unit shall be a dam and reservoir at or near the San Luis site, a forebay and afterbay, the San Luis Canal, the Pleasant Valley Canal, and necessary pumping plants, distribution systems, drains, channels, levees, flood works, and related facilities..."

1  Pub. Law. 86-488, § 1(a) (June 30, 1960).  Plaintiffs

2  maintain that Defendants have a mandatory duty under this

3  provision to provide irrigation service.  Compl. at ¶¶ 2,

4  30, 76.  Plaintiffs also allege, and Defendants do not

5  dispute, that defendants historically operated San Luis

6  Unit facilities to provide a full water supply under

7  water service contracts.  Compl. at ¶¶ 9, 46; Answer at

8  ¶¶ 9, 46.  The complaint further alleges that Defendants

9  are failing to operate the specified facilities for

10 irrigation service and, accordingly, are violating the

11 mandate.  Compl. at ¶¶ 9, 46.

12

13      More specifically, Plaintiffs argue that this Court's

14 decision in *Firebaugh Canal* and the Ninth Circuit's

15 affirming opinion establish, as a matter of law, that

16 defendants are legally bound under this sentence to

17 provide irrigation service.  Doc. 18 at 16.  In *Firebaugh*

18 *Canal*, plaintiffs, including Unit farmers and their

19 District, alleged that the government was violating the

20 sentence by not constructing the "necessary...drains"

21 referred to therein and was not providing drainage

22 service to the farmlands.  The Court granted plaintiffs'

23 motion for partial summary judgment, holding that the

24 sentence unambiguously mandates construction of the

25 specified facilities and that such mandate gives rise to

26

27

28

39

the obligation to provide drainage service to the Unit.
Memorandum Opinion and Order Re: Plaintiff's Motions for
Partial Summary Judgment, *Firebaugh Canal Co. v. United
States*, 1:88-cv-00634, at 6-17 (attached to Plaintiff's
Request for Judicial Notice ("PRJN") as Exhibit 6).
These holdings were confirmed, after trial on the
government's alleged defenses, in conclusions of law and
a partial judgment. *Id.* at Docs. 426 & 442 (Findings of
Fact and Conclusions of Law & Partial Judgment), PRJN
Exs. 7 & 8. The Ninth Circuit affirmed in relevant part,
holding that the second sentence of Section 1(a) of the
1960 Act unambiguously mandates provision of drainage
service, but that Interior retained discretion "as to how
it satisfies the drainage requirement." *Firebaugh Canal*,
203 F.3d at 573-74, 577-78.

Plaintiffs argue that the Ninth Circuit "repeatedly
referred to the government's consequent 'duty' to provide
service from the facilities at issue." Doc. 18 at 16
(citing 203 F.3d at 570, 575, 576, 577, 578). From this,
Plaintiffs maintain, *Firebaugh Canal* "compels the
conclusion that the second sentence of Section 1(a) of
the 1960 Act unambiguously mandates that the government
has a duty to provide irrigation service from the
specified facilities including the San Luis dam and

40

reservoir, the forebay and afterbay, the San Luis Canal, and necessary pumping plants and distribution systems." Doc. 18 at 16.

Plaintiffs read far too much into the district court and Ninth Circuit decisions in *Firebaugh Canal*. Irrigation service was not there directly at issue. At its core, *Firebaugh Canal* held that the second sentence of Section 1(a) created a mandatory duty to <u>construct</u> all of the physical "principal engineering features" of the Unit, including drainage facilities called for by the act.

> The statute directs that the "principal engineering features of said unit shall be [a dam, reservoir, etc.] and necessary ... drains." *Id.* (emphasis added). The term "shall" is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary. *Bennett v. Spear*, 520 U.S. 154 (1997). Here, there is no evidence that Congress misused the term "shall" or intended that the word is precatory, as asserted by the Government. Thus, although the Department of the Interior was only authorized (and not required) to construct the unit, once it decided to construct the unit, it was required to construct "necessary ... drains" as part of the unit. In other words, the Department's discretion was limited to the decision whether to build the unit, not to pick and choose which "principal engineering features" to include in the unit- Congress made that decision.

203 F.3d at 573-74.

The district court did conclude that "[t]he language

41

that 'necessary drains' be provided gives rise to the obligation to provide drainage." PRJN, Ex. 6 at 13. But, this referred to Interior's statutory obligation to construct facilities once Interior exercised its statutory authority to construct the Unit. The Ninth Circuit held drainage must be provided, but the means is left to the Agency. Assuming the necessary facilities are constructed pursuant to section 1(a), neither the district court nor the Ninth Circuit decisions in *Firebaugh Canal* say anything about how the Unit should be operated or water service provided.

For the same reason, Plaintiffs' suggestion that the government is bound to provide irrigation service by virtue of the doctrine of issue preclusion is without merit. Issue preclusion prevents a party from relitigating an issue decided in a previous action if four requirements are met:

> (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action.

*Kendall v Visa U.S.A., Inc.,* 518 F.3d 1042, 1050 (9th Cir. 2008). "The burden is on the party seeking to rely upon issue preclusion to prove each of the elements have

been met." *Id.* at 1051.  Here, Plaintiffs cannot possibly demonstrate that the second requirement is met, as the statutory issue presently before the Court, duty to provide irrigation, was not "actually litigated" in *Firebaugh Canal* or any other case.

Plaintiffs' further suggestion that "defendants are violating the [] duty to provide irrigation service," because they have reduced deliveries to comply with other statutory obligations relating to the operation of the CVP fails for two reasons.  First, Plaintiffs have not pointed to any language establishing a "duty to provide irrigation service."  Second, even if the second sentence of Section 1(a) could be read to establish some duty to provide irrigation service, it is undisputed that Defendants <u>do</u> provide irrigation service to the water districts in the Unit, who then, in turn, provide irrigation water to Plaintiffs pursuant to water service contracts formed and executed by Interior in discharging its statutory, non-mandatory authority to do so. Plaintiffs' real complaint is with the <u>volume</u> of irrigation water provided.  They have pointed to absolutely no language in Reclamation law that requires Federal Defendants to provide any particular volume of irrigation water, or that they operate the Unit to "full

43

capacity." Under § 2 of the 1937 Act, as amended by § 3406(a) of the CVPIA, CVP operations include actions necessary to benefit fish and wildlife habitat (a statutory mandate that Plaintiffs ignore throughout their briefs). Plaintiffs' suggestion that Reclamation is violating the law by operating the CVP and the Unit to benefit fish and wildlife is contradicted by the express promises of the CVPIA.

Plaintiffs do not fall within the zone of interest of this statutory provision and have not failed articulated a "clear duty to act" for purposes of the final agency action requirement.

### b. 43 U.S.C. § 521.

A 1920 amendment to the 1902 Act, codified at Title 43 United States Code, section 521, provides:

> The Secretary of the Interior in connection with the operations under the reclamation law is authorized to enter into contract to supply water from any project irrigation system for other purposes than irrigation, upon such conditions of delivery, use, and payment as he may deem proper: Provided, That the approval of such contract by the water-users' association or associations shall have first been obtained: Provided, That no such contract shall be entered into except upon a showing that there is no other practicable source of water supply for the purpose: Provided further, <u>That no water shall be furnished for the uses aforesaid if the delivery of such water shall be detrimental to the water service for such irrigation project</u>, nor to the rights of any prior appropriator: Provided further, That the moneys derived from

1

                    such contracts shall be covered into the
2                   reclamation fund and be placed to the credit of
                    the project from which such water is supplied.
3

4   (emphasis added).  "Detriment," within the meaning of

5   this section, occurs where the challenged use lessens

6   water deliveries to irrigated lands or perceptibly

7   injures or damages agricultural landowners.  *El Paso*

8   *County Water Improvement District v. El Paso*, 133 F.

9   Supp. 894, 920 (W.D. Tex. 1955), aff'd as modified, 243

10  F. 2d 927 (5th Cir. 1957).

11      Plaintiffs argue that this language "creates a

12  mandatory statutory duty to refrain from furnishing water

13  for non-irrigation uses if doing so shall be detrimental

14  to the project's irrigation water service."  Doc. 18 at

15  19.  Plaintiffs allege that defendants historically

16  operated the irrigation facilities without detriment to

17  irrigation service, Compl. at ¶¶ 9, 46, but that in

18  recent years, Defendants have been violating this mandate

19  because they are operating the CVP and the Unit to

20  furnish substantially all of the water for uses other

21  than irrigation, even though doing so is detrimental to

22  water service, *id*. at ¶ 51.

23      Title 43, United States Code section 521 must be read

24  as a whole.  It authorizes the Secretary of Interior to

25  enter into contracts for the sale of water from

26

27

28

irrigation projects for non-irrigation purposes if he or she deems it necessary, provided there is no other "practicable" source of water for those non-irrigation purposes, and provided that the non-irrigation use will not be "detrimental to the water service of such irrigation project, nor to the rights of any prior appropriator."  Plaintiffs do not allege that Reclamation has entered into <u>contracts</u> with other parties for non-irrigation purposes, let alone that any such contracts have caused them detriment. *See* Doc. 1.  To the extent that water deliveries have been curtailed to provide non-irrigation benefits, those curtailments have occurred in response to <u>statutory</u>, not contractual, requirements. *See O'Neill*, 50 F.3d 677.  Section 521 does not apply to the complained-about conduct.

Plaintiffs maintain that the third proviso "does not refer to contracts."  Doc. 43 at 3.  This ignores context.  The entire provision grants Reclamation permission to enter into contracts for non-irrigation purposes, provided certain conditions are met.  The third proviso is such a condition and applies only to Reclamation's capacity as a contractor for non-irrigation purposes.

Alternatively, Plaintiffs maintain that Reclamation

46

"has entered into and is performing numerous contracts with other federal, state, and local agencies for non-irrigation uses."  Doc. 43 at 4.  Specifically, Plaintiffs assert that the Coordinated Operating Agreement ("COA"), the Bay-Delta Accord, CALFED collaborative agreements, the implementation memorandum of understanding, the San Joaquin River Agreement, and the California Bay-Delta Memorandum of Understanding constitute "contracts" for the purposes of § 521.

These are not contracts for purposes of the Reclamation Act because, for all post-1926 projects, the United States is permitted to enter into "contracts" for reclamation water only with irrigation districts. *Klamath Irrigation District v. United States* provides the definition of Reclamation Act contracts:

> The Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. §§ 371 et seq.) (the Reclamation Act), directed the Secretary of the Interior (the Secretary) to reclaim arid lands in certain states through irrigation projects and then open those lands to entry by homesteaders. As recently recounted by the Supreme Court, this enactment "set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States." *Orff v. United States*, 545 U.S. 596, [598] (2005); *see also Nevada v. United States*, 463 U.S. 110, 115(1983); *California v. United States*, 438 U.S. 645, 650 (1978). Congress originally envisioned that the United States would "withdraw from public entry arid lands in specified western States, reclaim

47

the lands through irrigation projects," and then "restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself." *Nevada*, 463 U.S. at 115. Nonetheless, Congress specifically directed, in section 8 of the Reclamation Act, that the United States would act in accordance with state law to acquire title to the water used. 32 Stat. 390 (codified, in part, at 43 U.S.C. § 383); *see California*, 438 U.S. at 650-51. It gave the Department of the Interior responsibility for constructing reclamation projects and for administering the distribution of water to agricultural users in a project service area. *See* Reclamation Act, §§ 2-10, 32 Stat. 388-90.

In 1911, Congress enacted the Warren Act, ch. 141, 36 Stat. 925 (codified at 43 U.S.C. §§ 523-25), section 2 of which authorized the Secretary "to cooperate with irrigation districts, water users' associations, corporations, entrymen or water users ... for impounding, delivering, and carrying water for irrigation purposes." 43 U.S.C. § 524. Under a 1912 amendment of the Reclamation Act, individual water users served by a reclamation project could acquire a "water-right certificate" by proving that they had cultivated and reclaimed the land to which the certificate applied. Act of Aug. 9, 1912, ch. 278, § 1, 37 Stat. 265 (codified, as amended, at 43 U.S.C. § 541). Congress required that the individual's land patent and water right certificate would "expressly reserve to the United States a prior lien" for the payment of sums due to the United States in connection with the reclamation project. § 2, 37 Stat. 266 (codified at 43 U.S.C. § 542).

In 1922, Congress enacted legislation expanding the United States' options to allow it to contract not only with individual water users, but also with "any legally organized irrigation district." Act of May 15, 1922, ch. 190, § 1, 42 Stat. 541 (codified at 43 U.S.C. § 511). In the event of such a district contract, the United States was authorized to release liens against individual landowners, provided that the landowners agreed to be subject to "assessment

48

and levy for the collection of all moneys due and to become due to the United States by irrigation districts formed pursuant to State law and with which the United States shall have entered into contract therefor." § 2, 42 Stat. 542 (codified at 43 U.S.C. § 512).[FN3] The Fact-Finders Act of 1924, 43 Stat. 702 (codified at 43 U.S.C. §§ 500- 01), required that once two-thirds of a division of a reclamation project was covered by individual water-rights contracts, that division was required to organize itself into an irrigation district or similar entity in order to qualify for certain financial incentives. The newly-formed district would, thereafter, assume the "care, operation, and maintenance" of the project, and the United States would deal directly with the district instead of the individual water users. *Id.*

> FN3. The legislative history of the 1922 act reflects that Congress viewed these changes as significant. See H.R. Rep. No. 662, at 2 (1922) ("the Federal Government is dealing with the irrigation district instead of the individual owner or water users' association"); 62 Cong. Rec. 3573 (1922) (statement of Rep. Kinkaid) ("This language authorizes the taking of the district collectively, taking the lands of the district collectively, for the payment of the cost of the construction of the irrigation works, in lieu of holding each farm unit singly for its proportionate share of the cost of the construction."); id. at 3575 (statement of Rep. Mondell) ("The Reclamation Service has for years encouraged the organization of irrigation districts ... whereby the water users as a body, as a whole, become responsible for all of the charges."); *id.* at 5859 (statement of Sen. McNary) ("the Government is dealing with organized irrigation districts rather than the various individual entrymen who take water in the projects").

In 1926, Congress enacted additional measures providing that, thenceforth, the United States could enter into contracts for reclamation water

only with "an irrigation district or irrigation districts organized under State law." Act of May 25, 1926, ch. 383, § 46, 44 Stat. 649 (codified as amended at 43 U.S.C. § 423e). Thereafter, the United States contracted exclusively with irrigation districts. The exclusivity of these arrangements was reemphasized in the Reclamation Act of 1939, ch. 418, 53 Stat. 1187, section 9(d) of which provided that "[n]o water may be delivered for irrigation of lands ... until an organization, satisfactory in form and powers to the Secretary, has entered into a repayment contract with the United States." 53 Stat. at 1195 (codified at 43 U.S.C. § 485h(d)).

67 Fed. Cl. 504, 507-08 (2005).

Even if the COA, Bay-Delta Accord, CALFED collaborative agreements, implementation memorandum of understanding, San Joaquin River Agreement, and California Bay-Delta Memorandum of Understanding are contracts for some purposes, they are not contracts for the delivery of reclamation water or could not possibly cause detriment to Plaintiffs.  The COA, judicial notice of which has been taken in related cases, *see* 1:09-cv-00407, Consolidated Delta Smelt Cases, Doc. 696 Ex. 1, is an agreement between federal and state agencies, not including any irrigation districts.  The same applies to the Bay-Delta Accord[5] and Bay-Delta Memorandum of Understanding[6].  None of these could possibly trigger 43

---

[5] Available at: http://www.calwater.ca.gov/content/ Documents/library/SFBayDeltaAgreement.pdf (last visited Feb. 16, 2011).
[6] The Available at: http://calwater.ca.gov/content/Documents/

1    U.S.C. § 521 because they are not Reclamation Law

2    "contracts."

3        The San Joaquin River Agreement ("SJRA")[7] was

4    executed in 1999 and 2000 by several federal and state

5    agencies and a number of California irrigation districts

6    that make up the "San Joaquin River Group"[8] ("SJRG").

7    Pursuant to the SJRA, the SJRG agreed to provide water

8    needed for a pulse flow in the San Joaquin River

9    described in the SJRA, in exchange for payment by the

10   Bureau of Reclamation out of the CVPIA Restoration Fund.

11   This voluntary purchase of water could not cause the kind

12   of "detriment" to irrigators prohibited by § 521.

13

14       Finally, Plaintiffs have not provided any copies of

15   or citations to the "CALFED collaborative agreements"

16   they reference.

17

18       Plaintiffs' claims do not fall within the zone of

19   interests protected by § 521.  Plaintiffs have failed to

20   articulate a "clear duty to act" for purposes of the

21

22   _____

23   Amended_and_Restated_MOU_9-03.pdf (last visited Feb. 16, 2011).
     [7] Available at at http://www.sjrg.org/agreement.htm (last visited
     Feb. 16, 2011).

24   [8] The San Joaquin River Group consists of the San Joaquin River Group
     Authority ("SJRGA"), and its member agencies Modesto Irrigation
     District, Turlock Irrigation District, Merced Irrigation District,

25   South San Joaquin Irrigation District, and Oakdale Irrigation
     District; the San Joaquin River Exchange Contractors Water Authority

26   and its member agencies Central California  Irrigation District, San
     Luis Canal Company, Firebaugh Canal Water District and Columbia

27   Canal Company; the Friant Water Users Authority on behalf of its
     member agencies; and the City and County of San Francisco ("CCSF").

28   See SJRA at 1.3.

final agency action requirement.

### c. Section 6 of the 1902 Act.

Section 1 of the 1902 Act provides that certain moneys shall be appropriated as the Reclamation Fund to be used in the construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the West.  43 U.S.C. § 391.  Section 6 of the 1902 Act specifically authorizes Reclamation to use the Reclamation Fund for the operation and maintenance of project facilities:

> Interior is authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act.

§ 491.

Plaintiffs allege that Defendants are violating this provision by not operating the Unit at or near its full capacity.  *See* Doc. 18 at 20.  In support of this argument, Plaintiffs cite the dictionary definition of the term "operation" as "a doing or performing of a practical work...as part of a series of actions." Webster's Third New International Dictionary (Springfield: G&C Merriam, 1976), p. 1581.  Plaintiffs contend that "[f]unds are not used for operation of

irrigation works if the works are built but not used to
perform the work for which they were designed."  Doc. 18
at 20.  This definition and the related argument,
standing alone, go nowhere, because it is undisputed that
the Unit is being used to perform the type of work for
which it was designed -- delivering water to irrigators
and other users within the Unit.

Plaintiffs cite two cases to "illustrate the
principle that reclamation project works are intended by
Congress to be operated at or near their full capacity."
*Id.*  Plaintiffs first cite *Friends of the Earth v.
Armstrong*, 485 F.2d 1 (10th Cir. 1974), which addressed
Reclamation's operation of reclamation facilities on the
Colorado River, including Glen Canyon Dam and Lake
Powell, as authorized under the Colorado River Storage
Project Act of 1956, 43 U.S.C. § 620.  This Act also
contained two provisions relating to national monuments:
(1) the Bureau was to take adequate protective measures
to preclude impairment of a specified national monument
located near the Lake Powell; and (2) no dam or reservoir
constructed under the act was to be within any national
monument.  Between 1962 and 1968, appropriation acts were
passed under which Glen Canyon was completed.  Each
provided that no funds were available for construction of

facilities to prevent waters of Lake Powell from entering any national monument.  In 1968 Congress passed another act, two sections of which were premised on full operation of Lake Powell.

Environmental plaintiffs sued to keep water impounded in Lake Powell from backing up into Rainbow Bridge National Monument.  The Ninth Circuit found that the specific appropriations legislation enacted subsequent to the Storage Project Act intended that Lake Powell was to be maintained at capacity to make its related project components work (including those in the Lower Basin) and that the design features of Glen Canyon Dam made it clear that operating at the level the plaintiffs desired was not feasible.  *See* 485 F.2d at 10-12.  There is no specific legislation requiring operation of the CVP or San Luis Unit at or near capacity, nor do Plaintiffs point to any design features that suggest operation at or near full capacity is necessary.

Plaintiffs next cite *United States v. California*, 694 F.2d 1171 (9th Cir. 1982), which addressed SWRCB-imposed conditions limiting Reclamation's appropriation of water for irrigation from New Melones Dam.  The plaintiffs in that case argued that the specific conditions imposed were inconsistent with congressional directives as to New

Melones.   The Ninth Circuit rejected this argument:

> California, in Decision 1422, provided that no
> appropriation of water to the New Melones
> project for "consumptive uses" (largely,
> irrigation) would be allowed immediately.
> Condition 1 states in part:
>
>> Until further notice of the State Water
>> Resources Control Board, the water shall be
>> used only for preservation and enhancement
>> of fish and wildlife, recreation and water
>> quality control purposes.
>
> Condition 2 includes this statement of when
> water will be appropriated for irrigation:
>
>> Further order of the Board shall be preceded
>> by a showing that the benefits that will
>> accrue from a specific proposed use will
>> outweigh any damage that would result to
>> fish, wildlife and recreation in the
>> watershed above New Melones Dam and that the
>> permittee has firm commitments to deliver
>> water for such other purposes.
>
> This language is capable of broad construction,
> so that California might never allow <u>the full
> use of the dam</u> contemplated by Congress. Such a
> reading would raise serious questions of
> inconsistency with the federal statute, and the
> conflict might be of constitutional dimension.
> This is not our case, however, for California
> has interpreted the clause narrowly. California
> concedes in this litigation that the California
> Water Board cannot "permanently prevent full
> impoundment of water in the New Melones Project,
> <u>since this result would be directly inconsistent
> with the congressional mandate that the project
> shall eventually achieve full storage capacity.</u>"
> Cal. Opening Brief at 19 n.8. Congress has
> already weighed the benefits and costs; all that
> is needed is for the United States to "develop a
> plan for consumptive uses." *Id.* at 6. The
> district court held that "in the consumptive use
> segment of the decision, the Board, in effect,
> said to the Bureau, 'Show us your contracts and
> your ability to deliver the water and it may be
> available to you.'" 509 F. Supp. at 886; see
> also id. at 884. California has not disputed
> this interpretation on appeal.

*Id.* at 1177.

1    Plaintiffs focus exclusively on the emphasized text,

2   suggesting that the inclusion of this language in *United*

3   *States v. California* establishes the proposition that

4   whenever Reclamation is instructed to operate a facility,

5   it must do so "at or near full capacity."  *United States*

6   *v. California* says no such thing.  The reasoning quoted

7   above establishes only that <u>in that litigation</u> California

8   <u>conceded</u> that Congress mandated that New Melones "<u>shall</u>

9   <u>eventually achieve full storage capacity</u>," and that any

10  conditions imposed by the SWRCB must be interpreted to be

11  consistent with that mandate.  In fact, the Ninth Circuit

12  held in *United States v. California* that California's

13  restrictions on operation of New Melones did not conflict

14  with congressional policy to operate the reservoir at

15  full capacity because the conditions merely deferred full

16  operation.  *Id.* at 1178-70.  The New Melones authorizing

17  statute included language that arguably expresses

18  Congressional intent to operate the project at or above a

19  specific capacity:

20
            Provided further, That the Stanislaus River
21           Channel, from Goodwin Dam to the San Joaquin
             River, shall be maintained by the Secretary of
22           the Army <u>to a capacity of at least eight</u>
             <u>thousand cubic feet per second</u> subject to the
23           condition that responsible local interests agree
             to maintain private levees and to prevent
24           encroachment on the existing channel and
             floodway between the levees:
25

26

27

28
                              56

Section 203[2] of the Flood Control Act of 1962, Pub.L. 87-874, 76 Stat. 1173.  Plaintiffs point to no such specific operating mandate applicable to the San Luis Unit.

   *Friends of the Earth* and *United States v. California* concerned specific statutory provisions that are inapplicable here.  Plaintiffs do not explain how 43 U.S.C. § 491 or any subsequent act of Congress relevant to the Unit dictates the San Luis Unit shall operate at maximum capacity.

   Plaintiffs suggest that Section 6 of the 1902 act, 43 U.S.C. § 391, "directs operation of all works 'constructed,'" and prohibits "Interior to allow works constructed to sit idle."  Doc. 43 at 4-5.  More specifically, Plaintiffs contend that Section 6 does "not contemplate operation of any works constructed at 10% capacity.  Nor does it allow all but one of the delta pumps to be totally shut down...."  *Id*. at 5.  This theory finds no support in the statutory text.  Section 6 simply "authoriz[es] and direct[s]" Interior "to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act."  This constrains and controls Interior's use of the Reclamation Fund; it does not

mandate that any particular "works constructed" be operated to full or at any specific capacity.

Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

> d. **Second Proviso of Section 2 of the 1937 Act, As Amended.**

Plaintiffs next invoke the second proviso of Section 2 of the 1937 Act, which provided, before amendment:

> Provided further, That the entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order <u>to permit the full utilization of the works constructed to accomplish the aforesaid purposes</u>....

50 Stat. 844, 850 (Aug. 26, 1937). Plaintiffs focus on the emphasized text, insisting that this creates a directive and duty to operate the Unit to "full utilization," Doc. 18 at 22, rather than a legislative goal. Plaintiffs maintain that the facilities were "fully utilized" to provide irrigation water service to

Unit lands for decades and that the Unit is currently

"not being fully utilized, but [has been] left

substantially unused."  *Id*.

     To support this theory, Plaintiffs rely on *Friends of

the Earth*, asserting that, there, the Tenth Circuit

"interpreted the colliding statutory requirements so that

those contemplating full utilization of Lake Powell

overrode those contemplating half utilization of the

reservoir and non-use of the spillways."  *Id*.  Plaintiffs

also cite *United States v. California*, which, as

explained above, construed the New Melones legislation to

require "full use" and "full storage capacity" of the

dam.  694 F.2d. at 1177.  These cases do not control the

interpretation of the unique statutory provision here in

dispute.  Any statutory mandate to "fully utilize" the

Unit must be found in the provisions Plaintiffs cite.

     The second proviso of Section 2 of the 1937 Act was

specifically amended in 1992 by § 3406(a)(1) of the CVPIA

to permit the use of project water for the "mitigation,

protection, and restoration of fish and wildlife."  This

amendment specifies:

          In the second proviso of subsection (a), by
          inserting "and mitigation, protection, and
          restoration of fish and wildlife" after "Indian
          reservations,"

The amended proviso now reads:

1
2
3
4
5
6
7
8
9
10
11
12
13

> Provided further, That the entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, <u>and mitigation, protection, and restoration of fish and wildlife and other beneficial uses</u>, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes....

14

(emphasis on amendment).

15

    Plaintiffs acknowledge this language as amended,

16

which describes a co-equal statutory purpose of the CVP,

17

but insist that "what is called for therein is the 'full

18

utilization of the works constructed' to accomplish both

19

irrigation and fish and wildlife purposes."  Doc. 43 at

20

5.  Plaintiffs clarify that they do not claim Defendants

21

are violating this statute "by using CVP facilities for

22

other than irrigation purposes."  Doc. 43 at 6.

23

Plaintiffs argue "[t]he statute requires use of the

24

facilities for fish and wildlife, but it also requires

25

their use for irrigation.  The former requirement is

26

being performed; the latter requirement is being

27
28

violated." *Id.*  But, as discussed above, it is
undisputed that Defendants <u>do</u> provide irrigation service
to the water districts in the Unit, who then, in turn,
provide irrigation water to Plaintiffs; albeit on a
reduced level.  Plaintiffs' real complaint is with the
<u>volume</u> of irrigation water provided.

Plaintiffs further argue: "Defendants are serving
fish and wildlife not just by using CVP facilities, as
required, but by failing to use them.  Works sit
substantially idle so that water may flow to the Pacific.
This is inconsistent with the irrigation prong of the
proviso, and the fish and wildlife prong." *Id.*  However,
in adopting the CVPIA, Congress was aware that operation
of the federal and state pumping facilities in the Delta,
upon which any "full utilization" of the San Luis unit
depends, might pose inherent dangers to fish and
wildlife.  For example, the Senate Report accompanying
the passage of the CVPIA stated:

> The drafting of project water across the Delta
> by the State and Federal pumps is so strong that
> waterflow actually reverses, resulting in the
> intrusion of salt water into critical habitat
> areas, such as Suisun Marsh and the Delta.
>
> In average water years, 8 million Sacramento
> River salmon are diverted into the central and
> south delta area and more than half of these die
> as a direct result.  By one estimate 60-80
> percent of all Sacramento River juvenile salmon
> never make it past the Delta.  Up to 95 percent

1       of the entire San Joaquin River basin salmon
2       production is lost to the pumps.

3   S.R. Rep. No. 102-267 at 180 (1992).   Senator Bradley's

4   attached statement was even more specific.   He noted that

5   the U.S. Fish and Wildlife Service provided the Committee

6   on Energy and Natural Resources with a list of fishery

7   mitigation needs, including:

8       Improvements of Delta facilities (screens) and
9       operations, including perhaps pumping
    curtailments at critical periods.
10

11   *Id*. at 204.   Senator Bradley also quoted the California

12   Department of Fish and Game's "Central Valley Salmon and

13   Steelhead Restoration and Enhancement Plan" which stated:

14       Successful downstream migration of salmonid
    smolts is critical for the restoration of stocks
15       of salmon and steelhead.   The flows must be
    sufficient to carry the fish past all major
16       diversions.... Ultimately both State and Federal
17       projects should be modified to utilize a common
    intake or intakes with fish screens and
18       sufficient bypass flows.   The current trapping
    and trucking practice at the Delta pumps, as at
19       some other diversions, should only be considered
    a stopgap or supplemental measure.... <u>Increased</u>
20   <u>flows, pumping curtailment, adequate screens,</u>
21   <u>and appropriate operating criteria are the</u>
<u>solutions</u>....
22

23   *Id*. at 204-205 (emphasis added).

24       Plaintiffs' reading of the statute would preclude

25   curtailment of pumping to protect fish and wildlife

26   because doing so would not "full[ly] utilize[e] the works

27   constructed to accomplish the purposes" set forth in the

28

CVPIA.  Because Congress knew that pumping was causing problems for fish and wildlife and that pumping curtailments might be necessary to remedy those problems, Plaintiffs interpretation cannot be adopted.  Traditional canons of statutory construction require avoidance of literal interpretation of a statute that leads to an absurd result that is inconsistent with Congressional purpose.  *See Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("A literal reading of [statutes] which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose.").  A court should adhere to "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."  *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (internal quotation marks omitted).

Congress in the CVPIA redefined CVP purposes:

... to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, <u>and mitigation, protection, and restoration of fish and wildlife and other beneficial uses</u>, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full

1

2
utilization of the works constructed to
accomplish the aforesaid purposes....

3

4
The "full utilization of the works" language, which is

5
not separately defined, is contained within the same

6
clause as the generation and sale of electric energy

7
purpose.  The entire paragraph does not quantify or limit

8
the accomplishment of all the stated ("aforesaid")

9
purposes: (1) improving navigation; (2) regulating San

10
Joaquin and Sacramento River flows; (3) flood control;

11
(4) providing storage; (5) delivery of stored water; (6)

12
reclamation of arid and semiarid lands; (7) fish and

13
wildlife protection, mitigation, and restoration; (8)

14
other beneficial uses; and (9) generation and sale of

15
electric energy.

16

17
     A partial or even non-utilization of the works, where

18
the works are being utilized in the overall to accomplish

19
all such purposes, is enabled by the permissive term

20
"permit," which does not "require" full utilization at

21
all times.  The statute does not prescribe operating

22
limits nor does it specify what quantity or duration of

23
utilization of "the works" must be devoted annually to

24
CVP operations to achieve the legislative goals "to

25
accomplish the aforesaid purposes."  The language is

26
enabling, not limiting.

27

28
     The interest asserted by Plaintiffs in increased

**64**

water deliveries does not bear a plausible relationship to the policies underlying the second proviso of Section 2 of the 1937 Act, as amended.  Plaintiffs do not satisfy the zone of interest test and therefore do not have standing to bring this claim.  Even if Plaintiffs fall within one of the zone of interest of this statutory provision, there is no "clear duty to act" for purposes of the final agency action requirement.

e. Fourth Proviso of Section 2 of the 1937 Act.

The fourth proviso of Section 2 of the 1937 Act, as originally promulgated, provides that the CVP dams and reservoirs "shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and, third for power." 50 Stat. 844, 850 (Aug. 26, 1937).  This provision was amended by CVPIA § 3406(a)(2), to state:

> that the CVP dams and reservoirs "shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration purposes; and, third for power."

Plaintiffs argue that Defendants are violating a "mandate" in this proviso by not providing full irrigation service to Unit Lands.  Their argument has several premises:  First, Plaintiffs advance the uncontroversial proposition that Reclamation must use its

1  facilities for the purposes set forth in law.  For

2  example, Section 6 of the Boulder Canyon Project Act

3  provides that the dam and reservoir shall be used:

> First, for river regulation, improvement of
> navigation, and flood control; second, for
> irrigation and domestic uses and satisfaction of
> present perfected rights in pursuance of Article
> VIII of said Colorado River compact; and third,
> for power.

43 U.S.C. § 617e.  *Arizona v. California*, 373 U.S. 546,

566, 584 (1963), held that Interior "must" use the dam

and reservoir for the stated purposes.  *Id.* at 584.

Plaintiffs are correct that *Arizona v. California* stands

for the proposition that § 617e imposed an "obligation"

to satisfy the "present perfected rights" referenced

therein.  Doc. 18 at 23.  The relevance of that holding

to the present matter is limited.  The fourth proviso of

Section 2 of the 1937 Act contains no absolute

requirement that certain prior rights be satisfied.

Rather, it places irrigation, domestic, and fish and

wildlife mitigation on an equal level of priority.

Congress was aware of the possibility that use of the San

Luis Unit might have to be curtailed at certain times of

the year to serve fish and wildlife purposes.  This

proviso nowhere imposes any absolute obligation of full

utilization for irrigation.

     Plaintiffs then make the unsupported assertion that

Defendants are violating the fourth proviso of Section 2
of the 1937 Act by delivering only a fraction of the
Unit's customary supply.  Doc. 18 at 23.   Plaintiffs
acknowledge "both irrigation uses and non-irrigation
purposes are listed in the proviso," but nevertheless
insist "a violation is still occurring here."  *Id*.  Their
argument continues:

> Congress mandated that "the said dam and
> reservoirs shall be used" for such uses and such
> purposes.  The "said" facilities include the
> earlier referenced CVP "works" constructed,
> including the "canals" and "pumping plants."
> Here, the Bureau is not using such facilities,
> including the Jones Pumping Plaint and the Delta
> Mendota Canal, to any substantial extent for
> irrigation uses, as directed by Congress.  Even
> if non-irrigation purposes were now equal in
> priority to irrigation uses, equality is not
> reflected in a 10% allocation for the Unit, an
> integral part of the CVP.

*Id*.  This interpretation of the proviso requires the
Bureau to use such facilities to a more than "equal"
extent for irrigation uses, subject to priority flood
control use.  Plaintiffs' position is not supported by
the statutory text, which "permits" Interior to
accomplish all the purposes, which may include that the
pumps are not fully utilized for irrigation to meet ESA
requirements.

Plaintiffs further argue that, *assuming arguendo*
Section 2 does not prioritize irrigation over fish and
wildlife restoration, the fourth proviso should be read

in light of the "more specific first sentence of Section 1(a) of the 1960 Act."  Doc. 18 at 24.  As a general rule, a specific statute controls a conflicting general statute.  *Corley v. U.S.*, 129 S. Ct. 1558, 1568 (2009).

Section 1(a) of the 1960 San Luis Act provides:

> for the principal purpose of furnishing water for the irrigation of approximately five hundred thousand acres of land in Merced, Fresno, and Kings Counties, California, hereinafter referred to as the Federal San Luis unit service area, and as incidents thereto of furnishing water for municipal and domestic use and providing recreation and fish and wildlife benefits, the Secretary of the Interior ... is authorized to construct, operate, and maintain the San Luis unit as an integral part of the Central Valley Project.

74 Stat. 156, Pub. Law 86-488.

Plaintiffs assert that this establishes that, contrary to the general language in the CVPIA putting fish and wildlife purposes on equal footing with irrigation, Congress expressly indicated that the San Luis unit should be operated with its principal purpose being furnishing water for irrigation.

But, the 1992 CVPIA, at section 3406(a)(2), is specifically worded to reprioritize the purposes of <u>all</u> CVP facilities:

> ....CVP dams and reservoirs "shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration

**68**

1    purposes; and, third for power."

2  CVPIA § 3406(b) requires "[t]he Secretary, immediately

3  upon the enactment [of the CVPIA], shall operate the

4  Central Valley Project to meet all obligations under

5  state and federal law, including, but not limited to the

6  federal Endangered Species Act ... and all decisions of

7  the California State Water Resources Control Board."[9]

8  The language of § 3406(b) is unequivocal.  It applies to

9  the <u>entire</u> CVP, including the San Luis Unit, subjecting

10  all operations of the Unit to curtailments required to

11  meet state and federal fish and wildlife protection law,

12  including the ESA.  Plaintiffs' position that the San

13  Luis Act identifies the San Luis Unit as the only Unit in

14  the CVP for which irrigation is still the primary purpose

15  (subject to navigation and flood control), preventing

16  curtailment of irrigation uses to comply with

17

18  _____

19

20  [9] To the extent Plaintiffs simply argue that § 1(a) of the San Luis
    Act directs Reclamation to provide water to particular users in
21  particular amounts, this argument has previously been rejected:

22        Read as a whole, section 1(a) does not assign exclusive water
          rights to any party ....  Rather, it is a reaffirmation of
23        Congress's consistent treatment of the CVP as an expanding,
          coordinated water delivery system.  The San Luis Act, along
24        with other reclamation acts, explicitly gives the Bureau the
          authority to manage the CVP.  Section 1(a) explains how the San
25        Luis Unit fits into that system.  The section imposes no limit
          on the Bureau's discretion to make water management decisions
26        in the interests of an integrated water project.

27  *Westlands Water District v. United States*, 805 F. Supp. 1503, 1508
    (E.D. Cal. 1992), aff'd sub nom. *Westlands Water Dist. v. Firebaugh
    Canal Co.,* 10 F.3d 667 (9th Cir. 1993).

28
                              69

statutorily-mandated fish and wildlife protection obligated under the later-enacted CVPIA is without support.

Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

### 3. Alleged Failure to Exercise Water Rights.

Plaintiffs next point to four statutory provisions they maintain mandate that Defendants "exercise the water rights necessary to operate the CVP and the Unit by diverting, storing, conveying, and delivering water to Unit farmers who hold equitable interests in the rights that are both appurtenant to the lands irrigated and transferrable." Doc. 18 at 24.

Plaintiffs cite a series of cases in an attempt to establish that farmers within the Unit hold some form of enforceable "right" to water from the CVP as a matter of water law. Plaintiffs first cite *Ickes v. Fox*, 300 U.S. 82 (1937), which found that the United States was not an indispensable party to a lawsuit concerning reductions in deliveries of water to plaintiffs' land. Plaintiffs, landowners in the Yakima Valley, entered into a contract with the United States in 1906 which provided that, among

70

1   other things, the United States would construct works to

2   divert the waters of the Yakima river and its tributaries

3   for the irrigation of plaintiffs lands, provided that the

4   landowners initiate rights to the use of water from the

5   proposed irrigation works "as soon as may be."  *Id*. at

6   89.   In determining whether United States should be

7   deemed indispensible, the Supreme Court examined whether

8   the United States held title to the water rights.   The

9   Court concluded that the "the government did not become

10  the owner of the water-rights," because (1) "those rights

11  by act of Congress were made 'appurtenant to the land

12  irrigated,'"[10] and "by the contract with the government,

13  it was the land owners who were 'to initiate rights to

14  the use of water."  *Id*. at 93-94.  Accordingly, the

15  farmers had acquired "a vested right to the perpetual use

16  of the waters as appurtenant to their lands."  *Id*. at 94.

17  Interior's contention that ownership was vested in the

18  United States was "not well founded," as "[a]ppropriation

19  was made not for the use of the government, but, under

20  the Reclamation Act, for the use of the land owners."

21  *Id*. at 95.   The Court concluded that the right to the use

_____

[10] The referenced Act of Congress was codified as 43 U.S.C. § 372, which provides: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." *See Ickes*, 300 U.S. at 94 n.2.

of water, when acquired for irrigation, becomes, by express provision of the 1902 Act, "part and parcel of the land upon which it is applied." *Id.* at 95-96.

Plaintiffs next cite *Nebraska v. Wyoming*, 325 U.S. 589 (1945), which involved the use of water of the North Platte River by farmers in two federal reclamation projects (the North Platte Project and the Kendrick Project) and various private projects.  Three states had recognized appropriative rights in the owners of the lands to be irrigated.  In disposing of a claim by the government against those states, the Supreme Court addressed the appurtenancy and beneficial use requirements of the Section 8 proviso.  *Id.* at 611-16. After quoting the statute and language in *Ickes*, the court defined the water right, as follows: "The water right is appurtenant to the land, the owner of which is the appropriator.  The water right is acquired by perfecting an appropriation, i.e., by an actual diversion followed by an application ... of the water to a beneficial use." *Id.* at 614.  But, the Court specifically noted that the water rights became the property of the landowners by both "the terms of the law and of the contract[s]." *Id.*

Finally, Plaintiffs cite *Nevada v. United States*, 463

U.S. 110 (1983), which involved the Truckee River and the Newlands Reclamation Project. In 1944, water rights were adjudicated, including those of project irrigators and an Indian tribe. In 1973 the government brought suit on behalf of the tribe seeking additional water rights. The Supreme Court rejected the request, reasoning that the government's position, if accepted, would "do away with half a century of decided case law." Reviewing Section 8 of the 1902 Act[11], *Ickes* and *Nebraska*, *id*. at 122-25, the Court concluded the government was "completely mistaken" if it believed that the water rights "were likely so many bushels of wheat, to be bartered, sold, or shifted about as the Government might see fit." *Id*. at 126. The court held: "Once these lands were acquired by settlers in the Project, the Government's 'ownership' of the water rights was at most nominal; the beneficial interest in the rights confirmed to the Government resided in the owners

_____

[11] Section 8 of the 1902 Act provides:

> That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: Provided, That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

73

of the land within the Project to which these water

rights became appurtenant upon application of Project

water to the land."  *Id*.  Congress, in its wisdom,

"required the Secretary of the Interior to assume

substantial obligations" with respect to reclamation of

arid lands.  *Id*. at 128.  The Bureau ignored "the

obligations that necessarily devolve upon it from having

mere title to water rights for the Newlands Project,

where the beneficial ownership of these water rights

resides elsewhere."  *Id*. at 127.

Plaintiffs appear to cite these cases to establish

that they have acquired some form of water "right" that

transcends their contracts.  In all three cases relied

upon by Plaintiffs, the contracts between the United

States and the landowners directly provided that the

landowners either would take ownership of the water right

itself, or at the very least would possess a contractual

right to a fixed volume of water.  Here, no such

contracts are present.  Landowners to not directly

contract for water service with the government, only

water districts may so contract, *Klamath Irrigation

District*, 67 Fed. Cl. at 507-08; *see also Klamath Water

Users*, 204 F.3d 1206 (irrigators had no standing to bring

breach of contract claim against Reclamation because not

74

indended third-party beneficiaries of contract).

Likewise, where not inconsistent with congressional

objectives, conditions required by state law may be

imposed on the operation of reclamation projects,

including conditions designed to enhance fish and

wildlife habitat. *United States v. California*, 694 F.2d

at 1177-78; *see also O'Neill*, 50 F.3d at 682-86 (contract

allowed for delivery curtailments required by statute).

What the modern cases, *e.g., Klamath Water Users* and

*O'Neill*, establish is that contracts for federal water

service from Irrigation Districts do not create

continuing "water rights" that are enforceable, except in

strict compliance with identified contracts.

### a. 1920 Amendment to the 1902 Act.

The 1920 amendment to the 1902 Act provides:

> The Secretary of the Interior in connection with
> the operations under the reclamation law is
> authorized to enter into contract to supply
> water from any project irrigation system for
> other purposes than irrigation, upon such
> conditions of delivery, use, and payment as he
> may deem proper: Provided, That the approval of
> such contract by the water-users' association or
> associations shall have first been obtained:
> Provided,  That no such contract shall be
> entered into except upon a showing that there is
> no other practicable source of water supply for
> the purpose: <u>Provided further,  That no water</u>
> <u>shall be furnished for the uses aforesaid if the</u>
> <u>delivery of such water shall be detrimental to</u>
> <u>the water service for such irrigation project,</u>
> <u>nor to the rights of any prior appropriator:</u>
> Provided further,  That the moneys derived from
> such contracts shall be covered into the
> reclamation fund and be placed to the credit of

1          the project from which such water is supplied.

2    43 U.S.C. § 521 (emphasis added).

3        Plaintiffs argue they are "prior appropriators" as

4    that term is used in the statute:

5
6            The word "rights," as used in the 1920 statute,
             also appears four times in Section 8 and its
7            proviso. 43 U.S.C. §§ 372, 383, 485h-4.  A right
             is a right to the use of water, including any
8            such right of the government, the project
             operator, or any landowner, appropriator, or
9            user of water, the project beneficiaries.  The
             term "rights" is equally broad in the 1920
10           amendment to the 1902 Act.  It certainly
             includes the right to use water held by any Unit
11           grower.

12           The word "appropriator," especially as modified
             by the word "any," is a broad term that embraces
13           landowners and water users in a reclamation
             project.  This is shown by other provisions of
14           federal reclamation law and Supreme Court usage
             of the term "appropriator."

15           Section 8 of the 1902 Act provides, in relevant
             part, that "nothing herein shall in any way
16           affect any right of...the Federal Government or
             of any landowner, appropriator, or user of
17           water..." 43 U.S.C. §383 (emphasis added).  By
             using the term "any...appropriator" along with
18           the terms "landowner" and "user of water,"
             Congress intended that any such person,
19           including an "appropriator," could have an
             interest in a water right.  Here, each plaintiff
20           is a "user of water" or a "landowner" or both,
             and also an "appropriator."

21
             In *Nebraska*, the Supreme Court used the term
22           "appropriator" or "appropriators" dozens of
             times.  325 U.S. at 596, 600, 601, 602, 609,
23           613, 614, 615, 619, 620, 623, 624, 626, 627,
             629, 635, 639, 640, 643, 645, 654.  As to the
24           federal projects, the issue before the court
             involved allocation of water rights among
25           "appropriators."   *Id*. at 615.  The
             "appropriators" were the individual landowners.
26           Id. at 613, 615.  The water right was
             appurtenant to the land, the owner of which was
27           the "appropriator."   *Id*. at 614.  More
             generally, the court used multiple adjectives in
28           the opinion to modify the terms "appropriator"

                            76

or "appropriators," whether project irrigators or non-project irrigators, such as "individual" appropriators, "private" appropriators, "downstream" appropriators, "upper" and "lower" appropriators, "senior" and "junior" appropriators, and "Colorado," "Wyoming," and "Nebraska" appropriators. *Id.* at 601, 609, 619, 624, 626, 629, 639, 640, 645, 654.

The use of the adjective "prior" to modify "appropriator" could not have been intended by Congress to render the noun "appropriator" meaningless. Non-irrigation uses of water by the Bureau would be unlikely to be detrimental to any appropriator with rights senior to the project rights. Those at significant risk from non-irrigation uses of project water include project irrigators, whether they own the water rights outright or only the equitable or beneficial interest therein. Instead, the use of the word "prior" must have been intended to mean any holder of an interest in the right to use the water under the doctrine of prior appropriation.

Thus, project irrigators are protected by this clause. As users of the water, they are prior appropriators and they possess rights as such. Defendants are bound not to furnish project water for non-irrigation uses if doing so shall be detrimental to those rights.

Doc. 18 at 29-30.

Statutes are to be construed in a manner that gives effect to all of their terms. *Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("it is our duty to give effect, if possible, to every clause and word of a statute") (internal quotations and citations omitted). Therefore, a court must assume that when Congress used the term "prior," it meant prior. Under California law, applicable through § 8 of the Reclamation Act, the term "prior appropriator" has a specific meaning. *See, e.g.,*

*Wackerman Dairy, Inc. v. Wilson*, 7 F.3d 891, 896 n.11 (9th Cir. 1993) ("Under California law a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any.") (internal quotation and citation omitted).  The term, as defined by California law, is simply inapplicable to Plaintiffs' claims, as they are not (and could not be) claiming rights obtained through the prior appropriation doctrine. *See Del Puerto Water Dist. v. United States Bureau of Reclamation*, 271 F. Supp. 2d 1224, 1244-47 (E.D. Cal. 2003) (rejecting claim of allegedly senior "water contract delivery priority" and specifically finding no merit to plaintiffs' claim to hold any appropriative water right based on prior use, despite having put federal CVP contract water to use for over fifty years).

Even if "prior" were construed to mean "any," so that § 521 is read to protect the rights of any appropriator, Plaintiffs have not demonstrated that they are "appropriators" at all.  It is Reclamation that is the appropriator of waters for CVP purposes; Plaintiffs are customers of water districts that, in turn, have solely contractual rights to federal water the District obtains from Reclamation.  Under California law, even though

78

1   Reclamation itself does not apply project water to lands,

2   it remains the holder of the relevant water rights.

3           [T]he fact the Bureau does not consume water is
            not synonymous with having no substantial
4           interest in the water.  The Bureau has
            appropriative water rights in the Central Valley
5           Project.  The Bureau owns the CVP facilities,
            has operational control and responsibilities
6           relating to flood control, water supply, power
            generation, and fish and wildlife mitigation.
7

8   SWRCB D-1641.  Plaintiffs are not "appropriators" of

9   water merely because they use project water.  This law

10  was thoroughly reviewed and decided in the *Del Puerto*

11  *Water District* case and need not be further discussed.

12      Finally, 43 U.S.C. § 521 applies only to <u>contracts</u>

13  the Bureau may enter into to provide water for non-
14  irrigation purposes.  Plaintiffs do not here allege that
15
    their irrigation service has been diminished as a result
16
17  of any such contract.  They do not hold independent water

18  rights, except as defined and limited by their individual

19  water service contracts with Irrigation Districts.

20      Plaintiffs do not fall within the zone of interest of

21  this statutory provision and have failed to articulate a
22
    "clear duty to act" for purposes of the final agency
23
24  action requirement.

25          b. <u>Last sentence of Section 1(a) of the 1960
               Act.</u>
26

27      The last sentence of Section 1(a) of the 1960 Act

28  provides:

                            79

Construction of the San Luis unit shall not be commenced until the Secretary has (1) secured, or has satisfactory assurance of his ability to secure, all rights to the use of water which are necessary to carry out the purposes of the unit and the terms and conditions of this Act....

74 Stat. 156, Pub. L. 86-488.

Plaintiffs argue that Defendants' "recent failure to exercise the water rights threatens their security." Doc. 18 at 31.  Their argument is as follows:

The verb to "secure" means "to relieve from exposure from danger" or "to put beyond hazard of losing or of not receiving."  Webster's New International Dictionary, p. 2053.

....Interior's Solicitor has opined that the Bureau has a duty, not only to obtain the necessary water rights in the first instance, but also to "preserve, maintain, [and] protect" them over time.  97 Interior Dec., Dec. 21, 1989 WL 506913 (D.O.I) at 7, 8.

When Congress directed the Bureau, in the last sentence of Section 1(a) of the 1960 Act, not to construct the Unit until it had "secured" all water rights necessary to carry out the Unit's purposes, it required that the Bureau, not only obtain the rights initially, but also put them beyond risk of loss by continuing to exercise them thereafter.  The "purposes" of the Unit, to which the last sentence refers, as discussed above, are spelled out in the first sentence of Section 1(a) of the 1960 Act.  The "principal purpose" (among several others as "incidents" thereto) is furnishing water for irrigation of Unit lands.

The need to secure project water rights in the long-term, as well as the short-term, is obvious, for water rights may revert to the status of unappropriated water to the extent of any non-use for five years.  Cal. Water Code § 1241; compare *Barnes v. Hussa*, 136 Cal. App. 4th 1358, 1371-72 (2006) (finding no forfeiture) with *North Kern Water Storage District v. Kern Delta Water District*, 147 Cal. App. 4th 555, 560, 566 n.5, 577 n.10, 583, 584 (2007) (finding partial forfeiture).

80

1

2          To perfect the water rights for the Unit in the
           first instance, it was necessary for the Bureau

3          to divert, convey, and deliver the water supply
           and also for the farmers to apply the water to

4          their lands.  To be "secured," the water rights
           had to be exercised over time, and the required

5          government-grower cooperation did continue for
           decades.  But in recent years, the Bureau has

6          stopped diverting, conveying, and delivering
           most of the water for the farmers to use in

7          irrigating crops on Unit lands.  The rights
           necessary to carry out the purposes of the Unit,

8          including its principal purpose of irrigation,
           have been rendered insecure.  Thus, defendants

9          are failing to perform their statutory duty
           under the last sentence of Section 1(a) of the

10         1960 Act to secure all rights to the use of
           water necessary to carry out the Unit's

11         purposes.

*Id.* at 31-32.

12

13        Plaintiffs' argument is without merit.  The primary

14   purpose of the CVP is navigation and flood control.

15   California Water Code § 1241 provides that water rights

16   may be forfeited if not put to use for an authorized

17   purpose.

18         [w]hen the person entitled to the use of water
           fails to use beneficially all or any part of the

19         water claimed by him, for which a right of use
           has vested, for the purpose for which it was

20         appropriated or adjudicated, for a period of
           five years, such unused water may revert to the

21         public and shall, if reverted, be regarded as
           unappropriated public water.  Such re-version

22         shall occur upon a finding by the board
           following notice to the permittee and a public

23         hearing if requested by the permittee.

24   However, redirecting CVP water from irrigation to fish

25   and wildlife purposes (the act of which Plaintiffs

26   complain) poses no threat of reversion.  The CVPIA

27   authorizes the Bureau to beneficially use water for fish

28

and wildlife purposes.   In approving Reclamation's

petition for a change in purposes of use to better

accommodate the need to meet environmental objectives,

the SWRCB in D-1641 expressly endorsed the use of project

water for such purposes, against a challenge by Westlands

Water District, from whom the Plaintiffs obtain their

irrigation water delivered from the Unit.   The Bureau's

CVP water rights permits issued by the SWRCB now

expressly authorize use of CVP water for the statutory

co-equal purposes of irrigation and environmental

protection.

        Plaintiffs respond with the novel contention that the

amendments contained in the CVPIA "compel use of

facilities, not water... [and] do not impliedly amend the

last sentence of Section 1(a) of the 1960 Act."   Doc. 43

at 9.   First, Plaintiffs' attempt to confine the CVPIA's

changes to only "facilities" not "water" is totally

unsupported by the statutory text.   CVPIA § 3406 (a)(2)

amended the second proviso of subsection (a) of Section 2

of the reclamation Act of 1937, 50 Stat. 844, 850, to

provide:

> That the entire Central Valley project,
> California, heretofore authorized and
> established under the provisions of the
> Emergency Relief Appropriation Act of 1935 (49
> Stat. 115) and the First Deficiency
> Appropriation Act, fiscal year 1936 (49 Stat.
> 1622), is hereby reauthorized and declared to be

for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, <u>and mitigation, protection, and restoration of fish and wildlife,</u> and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes....

(emphasis on amendment).  This statute makes no distinction between facilities and water; rather it declares (and redefines) the purposes of the CVP. Plaintiffs' claim based on the last sentence of Section 1(a) of the 1960 Act is without merit.

Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

c. <u>Proviso of Section 8 of the 1902 Act.</u>

The proviso of Section 8 of the 1902 Act, as reenacted in 1956, provides, in part, as follows: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated." 43 U.S.C. §§ 372, 485h-4.  Plaintiffs maintain that defendants are currently violating the Section 8 proviso by "failing to exercise and, therefore, protect and

1   maintain the rights that are appurtenant to the lands of

2   Unit farmers."  Doc. 18 at 33.  This argument continues:

3           ...[T]he Supreme Court has repeatedly emphasized
            the salience of the appurtenancy mandate.  This
4           provision is a foundation of government duties
            and farmer rights.  *Ickes*, 300 U.S. at 93, 94,
5           95-96; *Nebraska*, 325 U.S. at 614; *Nevada*, 463
            U.S. at 126.  The proviso of Section 8 also
6           mandates that beneficial use shall be the basis,
            measure, and limit of the right.  43 U.S.C. §§
7           372, 485h-4.  Thus, the right to the use of
            water shall be appurtenant to the land on which
8           the water is beneficially used.

9           The appurtenancy principle is also crucial to
            the interests of the government.  By delivering
10          the project water to project beneficiaries for
            application to agricultural crops, it secures
11          its previously obtained water rights against
            possible reversion, and insures that farmers
12          will produce food, feed, and fiber for the
            nation.
13
            By failing to deliver most of the project water
14          to Unit farmers, the defendants are violating
            the command of the Section 8 proviso.  The water
15          is not being beneficially used on the lands to
            which the water rights are appurtenant.  Such
16          rights and lands are being placed in jeopardy by
            such non-use.  Again, the Bureau's recent public
17          documents take no account of this obligation.

18  *Id*.

19
        Federal Defendants correctly point out that the issue
20
    is not really whether use is "appurtenant" or not:  it is
21
    whether non-irrigation use is a valid purpose for project
22
    water and, if so, whether that use can be maintained even
23
    if it means curtailments of water contracted for by local
24
    water districts.  This has been extensively analyzed
25
    above.  Such alternative uses, chosen by Congress as
26
    equal CVP uses to achieve defined purposes, are plainly
27

28
                              **84**

valid.  All other aspects of Plaintiffs' arguments regarding liability under the proviso of Section 8 of the 1902 Act have already been considered and rejected. Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

> ### d. Allegation that Defendants are Violating Section 8 of the 1902 Act by Changing the Purpose and Place of Use of the Water Right to the Injury of the Legal Users of the Water.

Section 8 of the 1902, as reenacted in 1956, directs, among other things, that: "Interior, in carrying out the provisions of this Act shall proceed in conformity with the laws of any state relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder."  43 U.S.C. §§ 383, 485h-4.  California statutes govern changes of place or purpose of use of a water right. Cal. Water Code § 1700, *et seq.*  In particular, one statute mandates that "the change will not operate to the injury of any legal user of the water involved."  *Id.* at § 1702.  Plaintiffs allege that Defendants are violating these requirements by using most water for other purposes and at other places to the injury of legal users of the

water.   Doc. 18 at 33.   Their argument continues:

> Throughout the history of federal-state
> relations in the reclamation of arid lands in
> the West runs "the consistent thread of
> purposeful and continued deference to state
> water law by Congress." *California*, 438 U.S. at
> 653.   Section 8 reflects this "cooperative
> federalism." *Id.* at 650.   It mandates that
> state law shall control both "appropriation" and
> "distribution" of water, unless Congress has
> enacted inconsistent directives.   *Id.* at 665-69.
>
> Citing this statute and case, the Bureau wrote
> in 2008: "Reclamation must operate the CVP in a
> manner that does not impair senior or prior
> rights."   RJN ¶ 9.   But the scope of Section 8
> and the state law incorporated therein,
> including Section 1702, is broader than that.
>
> The term "legal user," as used in Section 1702,
> has a "plain meaning," and it is "broad."   It
> refers to the person who is "ultimately
> responsible for putting the water to its
> beneficial use."   Such persons are "an integral
> part" of the right to divert water from its
> source; without beneficial use of the water,
> there is "no right to take the water." *State
> Water Resources Control Board Cases*, 136 Cal.
> App. 4th 674, 800-04 (2006).
>
> Here, Unit farmers use the water for irrigation
> of their lands and, thereby, perfect the water
> rights initially and protect and preserve them
> over time.   Thus, each farmer is a legal user of
> the water involved.
>
> The term "injury," as used in Section 1702,
> means an injury to "rights." *State Water
> Resources Control Board Cases*, 136 Cal. App. 4th
> at  738-40, 803.
>
> Unit landowners and water users, including the
> plaintiffs, possess such rights.   As discussed
> above, they hold the equitable or beneficial
> interest in the project water rights.   Such
> rights are part and parcel of their lands.   And
> their interests in the rights are transferable
> at law.   These rights have clearly been injured
> by the changes in purpose and place of use of
> the project water imposed by defendants in
> recent years.   SSUF ¶ 1.
>
> Defendants are in violation of Section 1702 and,

1
2
3

> thus, Section 8 of the 1902 Act.  They are using
> most of the project water for uses other than
> irrigation and in places other than the Unit.
> SSUF ¶¶ 7, 8.   These changes unlawfully cause
> injury to the legal users of the water.

4   Doc. 18 at 34.

5       This ignores that the Bureau has applied for and

6   been granted a permit to change the place and purposes of

7   use with respect to CVP water in compliance with

8   California Water Code § 1702, as confirmed in D-1641,

9   upheld by the California Court of Appeals in *State Water*

10  *Resources Control Board Cases*, 136 Cal. App. 4th 674,

11  804-06 (2006).  This is the applicable state law.

12      Plaintiffs argue that D-1641 is not dispositive for

13  two reasons.  First, Plaintiffs point out that they were

14  not parties to the state administrative proceedings that

15  resulted in D-1641.  In addition, Plaintiffs argue that

16  "[t]he SWRCB did not rule on the questions whether any

17  Unit farmer was a 'legal user' of the water or whether he

18  or she suffered 'injury' as a result of the change.  D-

19  1641 does not specifically discuss the Unit nor does it

20  quantify the CVP purposes and places of use."  Doc. 43 at

21  10-11.

22      Plaintiffs' assertion amounts to a new challenge to

23  the permit issued by SWRCB in connection with D-1641.

24  The SWRCB has primary jurisdiction over questions

25  pertaining to the lawfulness of its permits under state

26
27
28

law.  *See* Cal. Water Code § 179 (State Water Resources Control Board "is vested with all of the powers, duties, purposes, responsibilities, and jurisdiction" of laws "under which permits or licenses to appropriate water are issued, denied, or revoked").  Federal courts lack jurisdiction to decide questions pertaining to state water permits.  *United States v. Fallbrook Pub. Util. Dist.*, 165 F. Supp. 806, 857 (S.D. Cal. 1958)(cited with approval in *Westlands Water Dist. v Patterson*, 900 F. Supp. 1304, 1317 (E.D. Cal. 1995), rev'd on other grounds 100 F.3d 94 (rejecting state law challenge to the reasonableness of certain CVP contractors' use of water for, among other things, failure to exhaust appropriate state administrative remedies)).[12]  Plaintiffs do not assert they have submitted their challenge to the SWRCB. Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

---

[12] The adoption proceedings for D-1641 were Publicly Noticed.  *See* SWRCB D-1641 at 3 (describing nature and timing of public notices). San Luis and Delta Mendota Water Authority, the California Public Water Agency representing Plaintiffs in contracting with the Bureau of Reclamation, participated in the hearings leading up to the issuance of D-1641.  *See* http://www.waterboards.ca.gov/waterrights/ water_issues/programs/bay_delta/decision_1641/ partyp2.shtml (last visited February 16, 2011).

**4.** **Statutes Pertaining to the Sale of Irrigation Water to Farmers to Recoup Project Costs.**

Plaintiffs point to a number of provisions of Reclamation law that they maintain "mandate that the Bureau sell water to irrigators to recoup project costs." Doc. 18 at 35.  Funds expended to construct and operate Reclamation projects are to be recouped through the sale of project water. *Peterson v. U.S Dept. of the Interior*, 899 F.2d 799, 804 (9th Cir. 1990).  Plaintiffs argue, generally that "[i]n recent years, however, defendants have refused to sell millions of acre feet of water to Unit farmers and, as a consequence, failed to take into the federal treasury roughly a billion dollars.  In the past four years alone, the government has forgone nearly $600 million of revenues in operating the Unit."  *Id*. Plaintiffs do not allege that Reclamation is not charging Unit users rates that impose charges to repay construction costs and to defray operation and maintenance expenses.  Plaintiffs' complaint is that water deliveries have been curtailed, and that these curtailments violate the statutes described below by causing the collection of less water revenue.  Federal Defendants maintain that this does not violate any of the statutory provisions invoked by Plaintiffs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          **a.** **Allegation that Defendants are Violating Section 4 of the 1902 Act by Failing to Sell Water and Collect Construction Charges.**

     Section 4 of the 1902 Act reads, in relevant part:

          **The construction charges which shall be made per acre ... upon lands in private ownership which may be irrigated by the waters of any irrigation project shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably.**

43 U.S.C. § 461.  Plaintiffs allege Defendants "are violating Section 4 of the 1902 Act by failing to sell irrigation water to Unit lands."  Doc. 18 at 35. Plaintiffs' legal basis for this allegation is as follows:

          **This statute is a directive by the Congress to the defendants.  *California*, 438 U.S. at 678 n.31; *Barcellos and Wolfsen v. Westlands Water District*, 899 F. 2d at 815, 817; *U.S. v. Westlands Water District*, 134 F. Supp. 2d at 1118.**

          **By refusing to sell most of the project water to Unit farmers, the Bureau is failing to return to the federal treasury the costs of construction of the CVP and Unit facilities.  The documents recently published by the Bureau setting out its current facility operation and water use plan take no account of this cost recoupment and revenue raising mandate.**

*Id*.

    It is undisputed that Federal Defendants do deliver some water to Plaintiffs each year and have charged Westlands and Plaintiffs have paid for that water in

accordance with the revenue-recoupment mandate.  Nothing in 43 U.S.C. § 461 instructs Interior to recoup costs in any particular urgency time sequence or amount per annum, let alone the maximum possible speed.  Rather, the language used suggests Interior retains discretion in the manner by which costs are recouped.  For example, Interior must set charges "with a <u>view</u> of returning to the reclamation fund the estimated cost of construction of the project...." (emphasis added)  Plaintiffs' contention that Interior is violating this cost recovery provision because it is not allocating to Plaintiffs (and therefore recovering charges from) their full contract amounts is without any basis in the statutory language. Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

> b. <u>Allegation that Defendants are Violating a 1914 Amendment to the 1902 Act by Failing to Collect Per-Acre-Foot Operation and Maintenance Charges.</u>

A 1914 amendment to the 1902 Act requires:

> In addition to the construction charge, every ... landowner under or upon a reclamation project shall also pay, whenever water service is available for the irrigation of his land, an operation and maintenance charge based upon the total cost of operation and maintenance of the project, or each separate unit thereof, and such charge shall be made for each acre-foot of water

delivered...

43 U.S.C. § 492.  Plaintiffs argue that "Defendants are violating this statutory command by refusing to sell millions of acre-feet of water to Unit irrigators and, thereby, failing to collect a billion dollars or so for the federal treasury."  Doc. 18 at 36.  In support of this argument, Plaintiffs cite only *Peterson*, 899 F. 2d at 804, which held that the plaintiffs in that case did not have a vested perpetual right to pay the original amount per acre charged for water service, and were not entitled to enforce the original prior and lower contract rates in light of the mandates of the Reclamation Reform Act.  Plaintiffs maintain that Congress did not "authorize deliveries equal to 10% of the delivery capability of the works constructed and the rights acquired."  This argument is facially invalid.  There is nothing in this statutory language that requires any particular volume of water be delivered.  Plaintiffs do not fall within the zone of interest of this statutory provision and have failed to articulate a "clear duty to act" for purposes of the final agency action requirement.

//

//

//

92

1

          **c. Allegation that Defendants are Violating a**
             **1926 Amendment to the 1902 Act by Failing**

2

             **to Collect Payments from Irrigators to**
             **Recoup the Cost of Constructing,**

3

             **Operating, and Maintaining the Project.**

4

      A 1926 amendment to the 1902 Act requires Interior to

5

enter into contracts with Irrigation Districts, which

6

provide for "payment ... of the cost of constructing,

7

operating, and maintaining of the works." 43 U.S.C. §

8

423e. Although Plaintiffs do not mention it, this

9

provision also requires Interior to ensure the cost of

10

construction is "repaid within such terms of years as the

11

Secretary may find to be necessary, in any event not more

12

than forty years...." *Id*. Plaintiffs again argue

13

"defendants are now violating this mandate by refusing to

14

sell most of the project water and, thereby, collect

15

payments to recoup project costs." Doc. 18 at 36-37

16

(citing Compl. at ¶¶ 10, 49, 61, 134).

17

      Congress explicitly directed Interior to administer

18

the 1926 amendments to the 1902 Act, including the above

19

statute, for the purpose of rehabilitating reclamation

20

projects and insuring their future success by placing

21

them on a sound operating and financial basis. 43 U.S.C.

22

§ 423f.[13] Plaintiffs argue:

23

24

25

26

27

28

---

[13] Section 423f provides:  "The purpose of sections 423 to 423g and
610 of this title is the rehabilitation of the several reclamation
projects and the insuring of their future success by placing them
upon a sound operative and business basis, and the Secretary of the

1
        **Selling a mere 10% of the saleable water cannot possibly square with [these statutory requirements]. Would any taxpayer conclude that defendants are operating the project on a sound financial basis? The government's new practice, under which millions of acre feet of saleable irrigation water are being directed to the Pacific, dwarfs other notorious instances of federal income forgone.**

2

3

4

5

6
Doc. 43 at 12.

7
     Plaintiffs are correct that these amendments provide

8
that a portion of capital costs and operating and

9
maintenance costs would be charged to water users.

10
*Peterson*, 899 F.2d at 804. However, nothing in these

11
provisions requires Reclamation to deliver any particular

12
<u>volume</u> of water to Plaintiffs. Even if the 40-year

13
repayment period described in § 423e imposed upon the

14

15
Bureau an obligation to recoup costs faster than is

16
occurring because of delivery restrictions, Plaintiffs

17
would not have standing to challenge Interior's failure

18
to do so. Although Plaintiffs are arguably harmed by the

19
delivery restrictions, the cause of those restrictions is

20
not fairly traceable to § 423e. To the extent that

21

22
Plaintiffs assert harm as a result of the lost revenues

23
to the treasury, any such harm is no different than harm

24
done to an ordinary taxpayer, who does not have standing

25
to bring such a challenge. *See Flast v. Cohen*, 392 U.S.

26
83, 88 (1968); *see also Bowker v. Morton*, 541 F.2d 1347,

27
_____

28
Interior is directed to administer said sections to those ends."

1349 n.2 (9th Cir. 1976)(users of federal project water

likely would not have standing to challenge failure to

apply federal reclamation law to state project irrigators

on the ground that such failure results in an "enormous

illegal subsidy" to state irrigators; federal users not

harmed by this illegal benefit in any way that

distinguishes them from an ordinary taxpayer).

> d. <u>Argument that Defendants are Violating a 1939 Amendment to the 1902 Act by Failing to Require Payment from Irrigators in Order to Recover Costs.</u>

A 1939 amendment to the 1902 Act provides, in

relevant part:

> [T]o cover that part of the cost of the construction of works connected with water supply and allocated to irrigation, Interior shall furnish water for irrigation purposes at such rates... as will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges..., due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation; and shall require payment of said rates each year in advance of delivery of water for said year.

43 U.S.C. § 485h(e).  This is another statutory amendment

on the road to Congress' efforts to increase cost

recovery after decades of litigation with Westlands'

members.  Plaintiffs allege Defendants "are currently

violating this statutory mandate by failing to sell water

to irrigators and, thereby, recover project costs."  Doc.

18 at 37.  **Plaintiffs' argument states, in its entirety:**

> Under this amendment, the sale of project water
> to irrigators must cover an appropriate share of
> the operation and maintenance costs and
> construction costs.  *Ivanhoe*, 357 U.S. at 278
> n.3, 286.  The statute is intended to allow the
> government "to cover the costs associated with
> furnishing water for irrigation purposes."
> Flint v. U.S., 906 F. 2d 471, 475 (9th Cir.
> 1990).
>
> Defendants are violating this 1939 statute by
> refusing to sell to Unit farmers their
> historical water supply.  As a result, project
> costs are not being recovered by defendants, as
> mandated by Congress.  Defendants' recent public
> documents make no mention of this duty.

*Id*. at 37-38.  Plaintiffs essentially argue that Congress

mandated that Reclamation sell CVP water to the extent of

full contract allocations in order to "produce revenues."

This reading of the law disregards numerous other

provisions permitting uses of water for purposes other

than irrigation and for excusing delivery obligations for

"any other cause."  As with § 423e, the harm of which

Plaintiffs complaint, reduced water deliveries, is not

fairly traceable to the operation of § 485(h), and

Plaintiffs point to no other harm that distinguishes them

from an ordinary taxpayer, depriving them of standing.

> **e.** **Allegation Defendants are Violating a
> Provision of the 1956 Amendments to the
> 1902 Act by Refusing to Sell Irrigation
> Water and, Thereby, Recoup Project Costs.**

     One provision of the 1956 amendments to the 1902 Act

provides that, in administering the above 1939 amendment

thereto, Interior shall "provide for payment of rates....

in advance of delivery of water..."   43 U.S.C. § 485h-

1(5).   Plaintiffs allege that defendants are failing to

sell water, collect charges, and recoup costs in

violation of this statutory language.   Doc. 18 at 38

(citing Compl. at ¶¶ 10, 49, 63, 144).   Plaintiffs

supporting argument states, in its entirety:

> This 1956 amendment to the 1902 Act sets forth
> certain mandates that Interior must follow in
> administering the above section of the 1939
> amendments to the 1902 Act.   *Ivanhoe*, 357 U.S.
> at 286-87, 297-99; *NRDC v. Houston*, 146 F. 3d at
> 1123, 1126.
>
> Interior is not providing for payment of water
> rates, as it is diverting water for non-
> irrigation uses outside of the Unit without
> receiving payment therefor.   Thus, project costs
> are not being recovered, as mandated by this
> 1956 amendment.   Documents recently published by
> the government describing project operations and
> water uses ignore this mandate.

*Id.*   Plaintiffs' citations are inapposite.   The cited

pages from *Ivanhoe* simply quote statutory language

pertaining to repayment.   *Houston*, 146 F.3d 1118, 1123,

1126, concerned long-term service contracts applicable to

the Friant Division of the CVP and nowhere suggests that

the statutory repayment provisions provide any guarantee

of water deliveries.   As with the previous arguments,

Plaintiffs do not have standing under this provision

based on a theory that they have been injured by reduced

deliveries.

**f. Plaintiffs' Theory That Defendants Are Violating Another Provision of the 1956 Amendments to the 1902 Act by Refusing to Sell Water and Recoup Costs.**

Finally, Plaintiffs cite another provision of the 1956 amendment that directs, in administering the 1939 amendment, Interior shall "include a reasonable construction component in the rates" set.   43 U.S.C. § 485h-1(6).   Plaintiffs argue that Defendants "are now violating the statute by refusing to sell irrigation water, collect water charges, and recoup construction costs."   Doc. 18 at 28 (citing Complaint at ¶¶ 10, 49, 64, 149).   Their argument continues:

> [T]he statute requires that Interior set water rates under which construction costs will be repaid to the federal treasury.   This requires that project water must be sold to irrigators rather than given away for non-irrigation uses, which recoups no construction costs.

> Defendants are violating this statutory duty to sell the project water and, thereby, recover the costs incurred by the government to create and administer the project.   They are, instead, refusing to sell most of the project water to Unit irrigators, as commanded by Congress, and allowing the water to be used without any charge for non-irrigation purposes and at places outside the Unit service area.   Recently published Bureau documents describe its plan for operating project facilities and delivering project water; these documents are utterly silent about this command of Congress.

> Defendants' recent refusals to sell project water are massive in scope.   Millions of acre-feet of project water have been given away for free, rather than sold, and the consequent shortfalls in federal revenues total about a billion dollars.   Defendants' refusals to sell water to Unit growers and, thereby, recoup federal costs contradicts the expressed will of

98

1        Congress.

2    Doc. 18 at 39.

3        This argument fails for numerous reasons.  First, it

4    completely ignores the CVPIA, which explicitly directs

5    Interior to operate the CVP in accordance with state and

6    federal fish and wildlife restoration mandates.  It also

7    disregards the force majeure provision of Westlands' CVP

8    water service contract with the Bureau, described in

9    *O'Neill*, which permits Interior to reduce water

10   deliveries for "any other cause" and in times of water

11   shortage.  In addition, the same standing bar discussed

12   above precludes Plaintiffs from pursuing a claim based

13   upon this statutory provision.  If Plaintiffs are relying

14   on reduced deliveries as their injury, that injury is not

15   fairly traceable to the identified statutory provision;

16   if Plaintiffs assert a "lost revenue" injury, there is no

17   basis upon which a court could distinguish such an injury

18   from that of an ordinary taxpayer, who would not have

19   standing.

20       It is anomalous that, after more than forty years of

21   arguing that water users should not pay increased "full

22   cost" for water service and O&M charges, Plaintiffs now

23   invoke the failed opportunity to pay more for such

24   charges as the basis for these claims of injury.

# V. CONCLUSION

This case arises in material part as a result of a political battle over the CVPIA, which changes the allocation of federal CVP water, fought and decided in Congress almost twenty (20) years ago.  The results have been damaging for water users.  Efforts to achieve legislative relief from the adverse effects of environmental and species protection and restoration mandated by the CVPIA have been largely unsuccessful. The solutions to these serious issues lie in the legislature, not the courts, which lack authority to rewrite the law.

For the reasons set forth above, Plaintiffs' claims all fail as a matter of law:

(1)  The claims based upon the first eleven statutory provisions fail for two independent reasons.  First, because the interest asserted by Plaintiffs in increased water deliveries does not bear a plausible relationship to the policies underlying all these statutory provisions, Plaintiffs do not satisfy the zone of interest test and therefore do not have standing. Alternatively because Plaintiffs have failed to articulate a "clear duty to act" (mandatory duty) for purposes of the final agency action requirement as to

these eleven statutory provisions, Plaintiffs' cannot invoke the APA to avoid the bar of sovereign immunity.

(2) As to the remaining four claims under a 1926 Amendment to the 1902 Act, a 1939 Amendment to the 1902 Act, and two provisions of the 1956 Amendments to the 1902 Act, Plaintiffs lack standing to sue.  If Plaintiffs are relying on reduced deliveries as their injury, that injury is not fairly traceable to the above statutory provision; if Plaintiffs assert a "lost revenue" injury, there is no basis upon which a court could distinguish such an injury from that of an ordinary taxpayer, who would not have standing.

Accordingly, although Plaintiffs' motion for judgment on the pleadings is GRANTED as to the exhaustion of administrative remedies and laches defenses, their motion for judgment on the pleadings is DENIED in all other respects, as is their motion for summary judgment that Defendants are violating the fifteen reclamation statutes discussed above.

Federal Defendants' cross motion for judgment on the pleadings is GRANTED in part.  Plaintiffs lack standing to sue and cannot satisfy the APA's final agency action requirement.  Federal Defendants are entitled to summary judgment as a matter of law as to all claims in the

Complaint.

Federal Defendants shall submit a proposed form of order consistent with this memorandum decision within 10 days of electronic service.


SO ORDERED
Dated:  February 16, 2011

                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                        United States District Judge